**In re the Application of Eric WOJCIK, Petitioner,**

v.

**Karen Marie WOJCIK, Respondent.**

No. 96–71392.

United States District Court, E.D. Michigan, Southern Division.

Feb. 11, 1997.

Cheryl A. Fletcher, Aren L. Fairchild, Dykema Gossett, P.L.L.C., Detroit, MI, for Petitioner.

Candace A. Crowley, Karen M. Boer, Macomb County Legal Aid Bureau, Clinton Township, MI, for Respondent.

## MEMORANDUM AND ORDER DENYING PETITION

COHN, District Judge.

### I. Introduction

This is a petition for the return of minor children pursuant to the Convention on the

Civil Aspects of International Child Abduction at the Hague, October 25, 1980, T.I.A.S. No. 11670 (the Convention), and the International Child Abduction Remedies Act (the Act), 42 U.S.C. §§ 11601–11610. Petitioner Eric Wojcik (the father) seeks the return of his two minor children, Jessica–Cecille and Jennifer, to France. The children are currently in the United States with their mother, respondent Karen Marie Wojcik (the mother).

For the reasons which follow, the petition will be denied.

## II. Facts

The Court makes the following findings of fact. The father is a French citizen. The mother is an American citizen. They were married in France on February 15, 1986, and made France their home. They had two children, both born in France: Jessica–Cecille, born on July 10, 1988, and Jennifer, born on March 24, 1991. Both children have dual citizenship in France and the United States. Between 1988 and 1994, the family visited the United States three times. During these visits, they stayed with the mother's family in Michigan.

On October 13, 1994, the mother took the children with her to the United States for a vacation that was supposed to last a couple weeks. The father knew and approved of this vacation. On November 1, 1994, the mother called the father from the United States and told him that neither she nor the children would return to France. She told the father they were staying with her brother in Roseville, Michigan, and gave the father the telephone number. The father had been to the brother's house on one of the family's visits.

On November 23, 1994, the father petitioned for divorce in France. The mother did not attend the hearing, but was represented by French counsel. The French court denied the mother's request for an international rogatory commission that would

allow her to answer the petition in the United States. The court issued a provisional ruling that "parental authority ... will be jointly shared by the two parents," and that the children "will have their usual residence" at the father's home in France. The mother filed a complaint for divorce in Macomb County, Michigan, on June 30, 1995. The record does not reflect the current status of the complaint.

On July 1, 1995, the father filed a request for the return of his children with the French Central Authority.[1] On July 17, 1995, the French Ministry of Justice telefaxed a letter to the Office of Children's Issues at the United States Department of State[2], asking for help under the Convention in returning the children to France. On July 18, the Office of Children's Issues telefaxed a letter to the French Central Authority that confirmed receipt of the request and stated that the Office had sent a letter to "Ms. Janet Hayes,"[3] requesting that she agree to return the children to France voluntarily.

On July 25, 1995, the mother's counsel contacted the Office of Children's Issues and related the mother's refusal to return the children to France. On January 30, 1996, the State Department forwarded the father's application to the National Center for Missing and Exploited Children (NCMEC), a private, nonprofit corporation that handles child abduction cases arising under the Convention. NCMEC arranged for legal aid in the United States for the father to seek the return of his children.

On March 27, 1996, the father filed the present petition for the return of his children pursuant to the Act, 42 U.S.C. § 11603(b). The Court held an evidentiary hearing on May 9, 1996, at which the mother was the sole witness. The mother testified that the father, from the beginning of their marriage, emotionally and occasionally physically abused her. The mother also testified that the father emotionally abused their daugh-

1. "A Contracting State shall designate a Central Authority to discharge the duties which are imposed by the convention upon such authorities." The Convention, Art. 6.

2. By Executive Order No. 12648, Aug. 11, 1988, the Department of State was designated the Central Authority of the United States.

3. In spite of the misaddress, the mother received the letter.

ters often and twice physically abused their eldest daughter.[4] As to the children's life in America, the mother testified as follows: she and the children lived in Roseville with her brother for approximately eight months before she rented her own house, where they lived at the time of the hearing; both children have attended the same school or daycare since their arrival and have friends and relatives in the area with whom they are close; the oldest, Jessica–Cecille, is not involved in community or church activities, but the whole family attends the same church every Sunday; and both have forgotten French and adopted English as their spoken language. Finally, the mother testified that she has worked at the same bank for more than a year.

### III. The Treaty and Statute

### A.

The signatory nations adopted the Convention in order "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention, Preamble. The United States ratified the Convention on April 29, 1988. France is also a signatory nation.

The Convention applies to "children wrongfully removed to or retained in any contracting State." Art. 1.a. The convention defines a retention as "wrongful[ ]" when:

a it is in breach of rights of custody attributed to a person … under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Art. 3.

A parent whose "child has been removed or retained in breach of custody rights may apply either to the Central Authority of the child's habitual residence or to the Central Authority of any other Contracting State for assistance in securing the return of the child." Art. 8. When a parent so applies, "[t]he Central Authority of the State where the child is shall take or cause to be taken all appropriate measures in order to obtain the voluntary return of the child." Art. 10.

The Convention establishes guidelines for considering an application for the return of children:

[w]here a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.

The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year … shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.

Art. 12. The Convention admonishes that the judicial and administrative authorities are "not [to] decide on the merits of rights of custody," Art. 16, and "[a] decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue," Art. 19.

The Convention also provides that a child need not be returned if the petitioning parent was not exercising custody rights when the child was retained, the parent consented to or acquiesced in the retention, "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," or "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Art. 13. Finally, "[t]he return of the child under the provisions of Article 12 may be refused if this would not be permitted by the fundamental

---

4. The mother asked that experts be allowed to testify as to the children's psychological health, but the Court denied this request, finding that the testimony would not be helpful to a determination of the issues before it. This ruling was not challenged.

principles of the requested State relating to the protection of human rights and fundamental freedoms." Art. 20.

## B.

The International Child Abduction Remedies Act implements the Convention in the United States. 42 U.S.C. §§ 11601–11610. In passing the Act, Congress found that under the Convention, "[c]hildren who are wrongfully removed or retained within the meaning of the convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies." § 11601(a)(4). The Act also reemphasizes that "[t]he Convention and this chapter empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims." § 11601(b)(4).

To enforce the Convention, Congress gave United States district courts concurrent jurisdiction with state courts over "actions arising under the Convention.". § 11603(a). A parent may initiate proceedings for the return of children under the Convention "by commencing a civil action," which is accomplished "by filing a petition for the relief sought in any court which has jurisdiction of such action." § 11603(b). "The court in which an action is brought under subsection (b) of this section shall decide the case in accordance with the convention." § 11603(d).

The Act establishes specific burdens of proof for the parent seeking the return of children (the petitioner) and the parent opposing return (the respondent):

(1) A petitioner ... shall establish by a *preponderance of the evidence* ... that the child has been wrongfully removed or retained within the meaning of the Convention....

(2) ... [A] respondent who opposes the return of the child has the burden of establishing—

(A) by *clear and convincing evidence* that one of the exceptions set forth in article 13b or 20 of the convention applies; and

(B) by a *preponderance of the evidence* that any other exception set forth in

article 12 or 13 of the Convention applies.

§ 11603(e) (emphases added).

## IV. The Father's Burden

The father's burden as the petitioner is to show by a preponderance of the evidence that "the child has been wrongfully removed or retained within the meaning of the Convention." § 11603(e)(1)(A). A child has been wrongfully removed or retained under the Convention if the removal or retention is "in breach of rights of custody ... under the law of the State in which the child was habitually resident ... and ... at the time of removal or retention those rights were actually exercised." Art. 3.a, b.

■ The father has met his burden of proving by a preponderance of the evidence that his daughters were wrongfully retained: (1) the children were habitual residents of France at the time of removal; (2) the removal was in breach of his custodial rights; and (3) he was exercising these rights of custody at the time of removal. First, the children were born in France, their father was French, their parents were married in France, and the children had been residing in France continuously until their removal. This is sufficient to show habitual residence. *See Friedrich v. Friedrich,* 983 F.2d 1396, 1402 (6th Cir.1993) (*Friedrich I* ) ("Thomas was born in Germany and resided exclusively in Germany until his mother removed him to the United States ... therefore, we hold that Thomas was a habitual resident of Germany at the time of his removal."). Second, under the laws of France, which govern pursuant to Art. 3.a, married parents enjoy a presumption of joint custody. Article 287 of the French Civil Code. Third, the father and the mother were living together with the children immediately before removal and the father exercised his parental rights before the children were wrongfully retained in the United States.

## V. The Mother's Defenses

■ "Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in

the Convention applies." 42 U.S.C. § 11601(a)(4). The exceptions "are not a basis for avoiding return of a child merely because an American court believes it can better or more quickly resolve a dispute." *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir.1996) (after remand by *Friedrich I* ).

The mother argues that she satisfied her burdens of proof in showing that at least one of the following four exceptions applies. First, the mother argues she showed by a preponderance of the evidence that: 1) more than a year passed from the "date of the wrongful removal or retention" to the commencement of the proceedings before the judicial authority and the children are "now settled in [their] new environment," Art. 12; and 2) the children have "attained an age and degree of maturity at which it is appropriate to take account" of their views and they object to being returned, Art. 13. Second, she says she showed by clear and convincing evidence that: 1) there is a grave risk that the children's return will result in physical or psychological harm for the children, Art. 13.b; and 2) the "fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms" do not permit the children's return, Art. 20.

## VI. The Article 12 Defense

### A.

Article 12 of the Convention provides that a child shall be returned "forthwith" if less than a year passed between the wrongful retention and "the commencement of the proceedings before the judicial or administrative authority of the Contacting State where the child is." If, however, more than a year passed between retention and commencement of the proceedings, and the mother can demonstrate by a preponderance of the evidence "that the child[ren] [are] now settled in [their] new environment," the children need not be returned.

The father argues that the "proceedings before the judicial or administrative authority" commenced when he filed his application with the United States Central Authority. Since the father's application to the United States Central Authority occurred less than one year after the wrongful retention of the children, the father argues that proceedings

were begun within one year of the wrongful retention and the children should be returned "forthwith," Art. 12. The mother argues that Article 12 allows for different adjudicative systems in different countries, but that in the United States the end of the year is measured only by the commencement of proceedings before a judicial authority. According to the mother, since more than a year passed between when the children were retained in the United States and the commencement of these proceedings before the Court, and since the children are now settled in their new environment, the Court should not order their return to France.

### B.

The key question, therefore, is whether the father "commence[d] ... proceedings before the judicial or administrative authority" when he contacted the Central Authority of the United States within a year of the wrongful retention, such that the "settled in [their] environment" exception to automatic return of the children does not apply.

### 1.

The Act provides that "the term '*commencement of proceedings*', as used in article 12 of the Convention, means, with respect to the return of a child located in the United States, the *filing of a petition in accordance with subsection (b) of this section*." 42 U.S.C. § 11603(f)(3) (emphases added). Subsection (b) of § 11603 states:

[a]ny person seeking to initiate judicial proceedings under the Convention for the return of a child may do so by commencing a *civil action by filing a petition* for the relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed.

(emphasis added). Under the Act, the father did not commence judicial or administrative proceedings when he contacted the United States Central Authority. Therefore, under the Act, the father did not commence judicial or administrative proceedings until more than a year after the children's wrongful retention and, if "it is demonstrated that the

child[ren] [are] now settled in [their] new environment," Art. 12, the Court may order that the children remain in the United States.

However, the Act states that "[t]he provisions of this chapter are in addition to and not in lieu of the provisions of the Convention." 42 U.S.C. § 11601(b). The Court must therefore look to the terms of the Convention to see if they require a different interpretation.

## 2.

Article 12 provides that if the child was wrongfully retained less than one year before "commencement of the proceedings before the judicial or administrative authority ... *the authority concerned* shall order the return of the child." (emphasis added). Since it is the judicial or administrative authority "concerned" that orders the child returned, only an authority with the power to order a child's return can be a judicial or administrative authority under Article 12. The Convention has a chapter devoted solely to Central Authorities, Art. 6, 7, in which no mention is made of the power to *order* a child's return. Article 6 provides that "Contracting State[s] shall designate a Central Authority to discharge the duties which are imposed by the Convention upon such authorities." Article 7 instructs that "Central Authorities shall cooperate with each other and promote cooperation amongst the competent authorities in their respective States." Article 7 then presents a list of measures for which Central Authorities are responsible. The list includes "secur[ing] the *voluntary* return of the child or ... bring[ing] about an amicable resolution of the issues," Art. 7.c. (emphasis added),[5] but does not include *ordering* the return of a child. Nor is the Central Authority given the power to order a child's return elsewhere in the Convention.

Other provisions of the Convention also show that the Central Authority is not a judicial or administrative authority as used in Article 12. Under Article 7.f, the Central Authority may "initiate or facilitate the institution of judicial or administrative proceedings." Contacting the Central Authority cannot suffice to commence administrative proceedings if one job of the Central Authority is to initiate the institution of administrative proceedings. Article 11 allows the Central Authority to request reasons for delay if the judicial or administrative authority has not reached a decision within six weeks of "the date of commencement of the proceedings." If contacting the Central Authority constituted commencement of the proceedings, the Central Authority itself would be the delaying party. Article 30 states that "[a]ny application submitted to the Central Authorities *or* directly to the judicial or administrative authorities ... shall be admissible in the courts or administrative authorities of the Contracting States." (emphasis added). Article 30 therefore distinguishes between submissions to a Central Authority and submissions to a judicial or administrative authority.

## 3.

The father cites to language in the *Explanatory Report*, Elisa Perez–Vera, Hague Conference on Private International Law, Acres et documents de la Quatorzieme Session, v. III, 1980 (the Report)[6], stating that Article 12 "has retained the date on which proceedings were commenced, instead of the date of decree, so that potential delays in acting on the part of the competent authorities will not harm the interests of parties protected by the Convention." ¶ 108. The father argues this language shows that the framers of the Convention anticipated that the Article 12 clock would stop upon the filing of an application with the Central Authority because, otherwise, delay by the authorities might harm the petitioner's interests. However, the language does no more than justify the choice of a date at the *beginning* of the process, rather than at the end, so that delays *once the proceedings commenced* would not adversely affect the par-

---

5. Article 10, in the chapter entitled "Return of Children," also only gives the Central Authority the power to "take or cause to be taken all appropriate measures in order to obtain the *voluntary* return of the child." (emphasis added).

6. Perez–Vera was the official reporter of the session at which the Convention was adopted, but the Report is not official.

ties. The language does not define *when* the relevant proceeding commences.

The drafters of the Convention rejected a proposal to define "judicial or administrative authorities." The Report states, however, that "it is clear that these are the authorities who have the power, according to the internal law of each Contracting State, to determine questions concerning a child's custody or protection." Report, ¶ 86. As discussed above, under the internal law of the United States, *i.e.,* the Act, the courts and not the Central Authority have the power to determine questions concerning a child's custody.

The Report also states that "[w]hen it is necessary, in order to obtain the child's return, for the judicial or administrative authorities of the State in which it is located to intervene, the Central Authority must itself initiate proceedings (if that can be done under its internal law) or facilitate the institution of proceedings." Report, ¶ 95; *see also,* Art. 7.f. Finally, Report ¶ 103 states that the Central Authority must pursue a child's voluntary return even after commencement of proceedings before a judicial or administrative authority. Thus, the Report acknowledges that contacting the Central Authority does not commence judicial or administrative proceedings.

The father cites to *Hemard v. Hemard,* No. 7–94CV–110–X (N.D. Tex. filed Feb. 15, 1995) (Findings of Fact and Conclusions of Law), an unreported case in which the District Court for the Northern District of Texas ordered the return of a child to France. The child's mother took the child from France to the United States after the father began divorce proceedings against her. The mother hid the child, but the father found out after nine months that the mother and child had entered the United States. The father filed an application for the return of his child with the United States Central Authority approximately ten months after the removal. The District Court found that "[a] period of less than one year elapsed from the date of the wrongful removal and/or retention until the date of the commencement of proceedings before the administrative authority in the United States." ¶ II.5. The District Court does not identify when the civil suit

was filed, but it was decided sixteen months after the removal.

The father argues that the *Hemard* Court treated the filing of the application with the Central Authority as commencement of proceedings before the administrative authority. This Court does not agree. It is not clear when the civil action in *Hemard* was filed, so the Court cannot say with certainty that the civil action was filed more than a year after the wrongful removal. The District Court's legal conclusions are unsupported and run contrary to the provisions of the Act and the Convention cited above. And finally, the District Court found that "[t]he time for commencing proceedings before the judicial authority was tolled pending the location of the child," ¶ II.6, and therefore even if the civil action was filed more than a year after the removal, the clock may have run less than a year. For these reasons, the Court does not find *Hemard* persuasive for the proposition that an application with the Central Authority commences an administrative proceeding under Article 12.

### 4.

In the United States, under both the Act and the Convention, the relevant Article 12 period is the time between the wrongful retention and the commencement of a civil action under 42 U.S.C. § 11603(b). The Convention used the term "administrative authorities" not to include the Central Authority, but because the drafters of the Convention needed to allow for variety in the mechanisms of how to order a child's return. As stated in the Report, "references to administrative authorities must be understood as a simple reflection of the fact that, in certain Member States, the task in question [the protection of minors] is entrusted to such authorities while in the majority of legal systems jurisdiction belongs to the judicial authorities." ¶ 44.

### C.

### 1.

■ Having thus interpreted Article 12, the Court must now apply it to the facts at hand. There is no reason in this case, as there might be in others, to refuse to apply

Article 12 for equitable reasons. The mother did not hide the children; in fact, she called the father the first day of the wrongful retention and told him where they were. *Cf. Hemard,* ¶ 1.15. Still, eight months passed between the wrongful retention of the children in November of 1994 and the father's contacting the French Central Authority in July of 1995. The record does not reflect any action taken by the father during that time, aside from filing for divorce, to have his children returned to France. Less than one month after the French Central Authority was contacted, the mother had been asked to return the children and had refused. Therefore, the Court will order the return of the children unless the mother has shown by a preponderance of the evidence, 42 U.S.C. § 11603(e)(2)(B), that "the child[ren are] now settled in [their] new environment." Art. 12.

### 2.

The mother has established by a preponderance of the evidence that, as of the hearing: the children had been in the United States for eighteen months; the mother and the children had initially lived with the mother's brother for eight months until they moved into a rented house of their own, where they still lived; both children had been attending school or day care consistently; both had friends and relatives in the area; the family attended church regularly; and the mother had stable employment with the same employer for more than a year. While not agreeing with all of the mother's testimony, the father provided no evidence to call it into question. And aside from the father's family—a family that the mother testified was indifferent to the children at best—the father has shown no evidence that the children have maintained any ties to France.

### 3.

█ The mother has shown by a preponderance of the evidence that the children, eight and five years old at the time of the hearing, were settled in their new environment as of the time of the hearing. *Cf.*

*David S. v. Zamira S.,* 151 Misc.2d 630, 574 N.Y.S.2d 429, 433 (N.Y.Fam.Ct.1991) (finding a three-year-old and a one-year-old were not settled in their new environment because they were too young to forge strong friendships, and they were "not yet involved in school, extra-curricular, community, religious or social activities which children of an older age would be"). The Court therefore will deny the petition.[7] The Court's decision is not a decision on who should have custody of the children, or where the children should ultimately live, or even that the children are settled in the United States for the purposes of determining custody. The Court is merely holding that the custody decision should be made in the United States.

### VII. The Motion to Strike

After the evidentiary hearing, the Court asked the parties to file supplemental papers. In one of her briefs, the mother refers to certain statements allegedly made by the father during compromise negotiations. The father has filed a motion to strike these references. The alleged statements are not relevant to any issue discussed above and the Court did not consider them. Therefore the motion is moot and will be denied.

### VIII. Conclusion

For the reasons stated above, the father's petition for the return of Jessica–Cecille and Jennifer to France under the Convention and the Act is DENIED. The father's Motion to Strike Evidence of Conduct and Statements is DENIED.

SO ORDERED.

---

7. Denial of the petition is proper under Article 12, so the Court will not examine the other defenses asserted by the mother.