**Tesfaie BELAY, Petitioner,**

v.

**Tsion GETACHEW, Respondent.**

**No. CIV.A.AW–03–761.**

United States District Court,
D. Maryland,
Southern Division.

July 8, 2003.

Michele Anne Ferris Hansen, Ferris, Hansen, and Gorvoy, Greenbelt, MD, for petitioner.

Nathaniel Sims, Washington, DC, Maria Elena Mena, Silver Spring, MD, for respondent.

### MEMORANDUM OPINION

WILLIAMS, District Judge.

Tesfaie Belay ("Petitioner") filed a Petition for Return of Child pursuant to the Hague Convention on the Civil Aspects of Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11, 670, 1343 U.N.T.S. 49, 19 I.L.M. 1501 (1980)("Hague Convention" or "Convention"), a treaty implemented in the United States by the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601–11610. Petitioner alleges that Tsion Getachew ("Respondent") "wrongfully removed" the couple's child, Eden Belay ("Eden"), from Sweden to the United States. He asks the Court to order that the child be returned to Sweden, the place of her habitual residence before the alleged wrongful removal, in accordance with the mandates of the Hague Convention. The Court held a preliminary hearing on April 21, 2003 at which time both parties and the child were present. The Court then held a two-day evidentiary hearing during which both parties were allowed to present evidence and witness testimony. The matter is now ripe for disposition. Having reviewed the entire record, including the testimony of both parties and the arguments made at the hearing by counsel, the Court concludes that Eden was "wrongfully removed" from Sweden within the meaning of the Convention. The Court further holds that although Respondent has established the "well-settled" defense under Article 12, equitable considerations mandate that the child still be returned because Eden only became "well-settled" as a result of the

concealment of the child by Respondent. The Court will therefore order that the child be returned to Sweden forthwith.

## I. FACTUAL AND PROCEDURAL HISTORY

Petitioner and Respondent, who are members of different ethnic tribes, emigrated from Ethiopia to Sweden in 1991. Shortly thereafter, they were married. Although the record is unclear as to the exact date, at some time after their arrival Sweden both parties were granted Swedish citizenship.

Eden was born in Sweden on July 17, 1994. She lived in Sweden from that time until she was taken to the United States by her mother on June 21, 2000. The parties presented contradictory evidence about the state of the couple's marriage. Petitioner alleged during his testimony that while there may have been minor disputes between him and Respondent, at no time did he consider them to be serious. Respondent, on the other hand, alleges that their marriage deteriorated rapidly. She testified that he tried to control her through the use of the couple's bank account. She further testified that at times he verbally abused her. Lastly, she alleged that on certain occasions, she was the victim of physical abuse. In support of this allegation, she only referenced two specific instances. On one occasion, she testified that Petitioner "kicked" her. She also alleged that prior to her travel to the United States, he put his hands around her throat and threatened her. Petitioner flatly denied the latter allegation.

Some facts corroborate Respondent's view of the marriage. For example, relatives of hers from the United States testified that she informed them on numerous occasions of the abuse. Furthermore, in 1998, she visited a shelter for battered women. She at no time moved out of the house. Although she claimed that Eden had to bear witness to the marital abuse, she never testified that Eden was the victim of any abuse by her father. The evidence presented on the issue of the relationship between Eden and her father demonstrated that they apparently had a healthy and loving relationship.

In Summer of 2000, Respondent decided that she would leave Sweden, moving to the United States with Eden. She did not inform Petitioner of her decision. Instead, she told him that she would take Eden on a five week vacation to visit relatives in the Washington, D.C. area. She bought a round-trip ticket to the that effect. There can no question, however, that Respondent always planned to stay in the United States. Shortly after arriving in the U.S., she called Petitioner to inform him that she would not be returning.

Respondent moved into an apartment with her brother in Takoma Park, Maryland. Although the evidence presented is slightly murky on this issue, Eden has apparently lived at that address now for three years. Respondent immediately decided to conceal the location of herself and Eden. She phoned Petitioner on occasion, allowing Eden to talk with him, but never revealed a city or other location. She never gave him a phone number where he could reach them, nor an address. Eden was enrolled at a local elementary school, where she has been for three years. When Respondent enrolled the child, she presented herself as Meti Terfassa.[1]

Petitioner traveled to the United States at the end of 2000. Upon arrival, he

---

1. Petitioner attempts to make much of the fact that she used a different name when enrolling the child. The Court does not read that as meaning she was trying to use a fraud-ulent name. It is clear that Terfassa is a family name or tribal name. She was not, therefore, using the name Terfassa as some sort of alias.

learned that Respondent and Eden had traveled to Minnesota. Petitioner alleges that Respondent knew that he was coming and took Eden away to hide her. Petitioner then returned to Sweden. The record is unclear as to what actions Petitioner took upon his return to Sweden. It is apparent that he contacted authorities in Sweden, however, because on February 12, 2001, the Central Authority in Sweden filed an application with the U.S. State Department for the return of Eden pursuant to the Hague Convention. The application was passed on to the National Center for Missing and Exploited Children ("NCMEC"), which handles the search for "abducted" children within the purview of the treaty.

NCMEC "located" Respondent and Eden on October 5, 2001. An important issue that was left undeveloped at trial is whether Petitioner was ever informed of the location of the child. In any event, in December 2001, Petitioner again traveled to the United States. He met with his then-brother-in-law, who was also the person with whom Eden and Respondent were staying. Respondent's brother would not inform Petitioner as to the location of the child. They discussed arranging a meeting between the parents at which time the parties could potentially discuss a resolution. A meeting was called between the parties before local church elders. At that meeting, both parties testified that Petitioner dropped to his knees, weeping and begging Respondent for "forgiveness". The parties were not able to settle their differences. Later that week, Petitioner was brought to a house where he was able to see his daughter for the first time in nearly a year and half. He was only allowed to see her for fifteen minutes.

He thereafter returned again to Sweden. Meanwhile, NCMEC arranged for Respondent to have an attorney. No action appears to have been taken on the case between October 5, 2001 and March of 2002, at which point the appointed attorney informed NCMEC that he had lost contact with Respondent. NCMEC "relocated" Respondent and child in February of 2003, eventually passing that information on to Petitioner. Respondent did not call any witnesses at trial to inquire as to the actions (or inactions) taken by NCMEC and Petitioner in the time between March of 2002 and February 2003. In March 2003, Petitioner filed his petition in this Court. He has since returned to Sweden awaiting decision in the case. The parties have recently been divorced.

## II. THE HAGUE CONVENTION

Chapters I and II of the Hague Convention on the Civil Aspects of Child Abduction state in pertinent part:

Article 1: The objects of the present convention are-

a) to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and

b) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.

\* · \* \* \* \* \*

Article 3

The removal or the retention of a child is to considered wrongful where-

a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been

so exercised but for the removal or retention.

\* \* \* \* \* \*

Article 12

Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.

The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now well-settled in its new environment.

Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11, 670, 1343 U.N.T.S. 49, 19 I.L.M. 1501 (1980). The Preamble states that it is the intention of the signatory nations "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the state of their habitual residence . . . ." Hague Convention, Preamble, 19 I.L.M. 1501(1980).

The United States became a signatory to the Convention when Congress enacted ICARA. Finding that "the international abduction or wrongful retention of children is harmful to their well being," Congress granted courts the authority to promptly return children wrongfully removed or re-

tained within the meaning of the Convention. *See* 42 U.S.C. § 11601. This Court derives its jurisdiction to hear the Hague Petition from ICARA. *Id.* at § 11603(a) (granting concurrent jurisdiction to state and federal courts).

"The primary purpose of the Hague Convention is 'to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court.' " *Miller v. Miller,* 240 F.3d 392, 398 (4th Cir.2001)(quoting *Friedrich v. Friedrich,* 983 F.2d 1396, 1400 (6th Cir.1993)(*"Friedrich I"*)). *See also Feder v. Evans–Feder,* 63 F.3d 217, 221 (3rd Cir.1995)("[The Convention] is designed to restore the 'factual' status quo which is unilaterally altered when a parent abducts a child and aims to protect the legal custody rights of the non-abducting parent."); *Shalit v. Coppe,* 182 F.3d 1124, 1127 (9th Cir.1999). The statute is clear that courts should not inquire into the underlying merits of the custody dispute. To the contrary, " 'the Convention was meant, in part, to lend priority to the custody determination hailing from the child's state of habitual residence.' " *Miller,* 240 F.3d at 398 (quoting *Ohlander v. Larson,* 114 F.3d 1531, 1541 (10th Cir.1997)); *Delvoye v. Lee,* 224 F.Supp.2d 843, 847 (D.N.J.2002). The Court is therefore instructed to determine only the more narrow issue of whether Petitioner has shown that the children have been "wrongfully retained". *See Feder,* 63 F.3d at 221; *Escaf v. Rodriquez,* 200 F.Supp.2d 603, 611 (E.D.Va.2002).[2] The determination of custody is "made by the proper court or authorities of the country where the child habitually resides." *In re Rodriguez,* 33 F.Supp.2d 456, 458 (D.Md.1999).

---

**2.** "[T]he focus of a court's inquiry in a Hague Convention case is not 'the best interests of the child,' as it typically is in a state custody case; rather, it is the specific claims and defenses under the Convention, namely whether a child has been wrongfully removed

to, or retained in, a country different from the child's habitual residence and, if so, whether any of the Convention's defenses apply to bar the child's return to his habitual residence." *Escaf,* 200 F.Supp.2d at 611.

The analytical framework for determining the outcome of Hague petitions in therefore straight-forward. First, the Court must determine whether Petitioner has established a prima facie case of wrongful removal. Second, Respondent then has the opportunity to argue that an affirmative defense should apply. If the Court determines that the child has been wrongfully removed and that no affirmative defenses have been established, the Court must order the return of the child.

## III. WRONGFUL REMOVAL

■ Although Respondent continues to assert in her papers that there was no "wrongful removal", despite an oral finding made from the bench to the contrary, the Court holds that Petitioner has established the prima facie case of wrongful removal. In order to establish a prima facie case, Petitioner must show: (1) that the child was habitually resident in Sweden prior to the removal; (2) the removal was in breach of Petitioner's custody rights; and (3) Petitioner was exercising those custody rights at the time of removal. *Miller v. Miller*, 240 F.3d 392, 398 (4th Cir.2001).

All of these elements have been conclusively established. First, Eden had lived in only place, Sweden, from the time of birth onward. Second, there is no dispute that both parents were exercising custody rights at the time of the removal. Eden had lived in a house with both parents her entire life. Lastly, Petitioner has established that he was exercising those rights prior to removal. There is no evidence that he ever relinquished custody rights. He always believed that Respondent would return after spending five weeks in the United States. Therefore, despite Respondent's repeated insistence that the removal was not "wrongful", it appears to have been just that.

## IV. DEFENSES

Since Petitioner has established that the child was wrongfully removed, the burden shifts to Respondent to establish that any of the Convention's affirmative defenses are applicable. Petitioner made three arguments based on affirmative defenses: (1) there is a grave risk that Eden would exposed to physical and psychological harm were she to be returned to Sweden; (2) Petitioner has "acquiesced" to the removal; and (3) Eden is now well-settled in the United States, and Petitioner commenced the judicial action more than one-year after the wrongful removal.

### A) *Grave Risk of Harm*

■ Respondent has testified that she suffered abuse, both verbal and physical, at the hands of Petitioner while they were married. She claims that by returning Eden to Sweden, where she would be in contact with Petitioner, the Court would risk exposing Eden to physical or psychological harm. The Court concludes that Respondent has failed to establish by clear and convincing evidence that Eden would be exposed physical or psychological harm.

■ Among the defenses to petitions brought under the Convention is the "grave risk of harm" defense. *See* Hague Convention, Article 13(b). Giving the Convention's strong preference for the return of "wrongfully-removed" children, "[e]xceptions to the general rule of expedited return, including Article 13(b), are to be construed narrowly." *Danaipour v. McLarey*, 286 F.3d 1, 14 (1st Cir.2002). As evidence of the Convention's presumption for return, it demands that the "grave risk" exception be proven by clear and convincing evidence. *See Miller*, 240 F.3d at 402.[3]

---

**3.** The Fourth Circuit has indicated that in cases where the defense is raised based upon

the risk that the child will suffer abuse, courts

■ Although Respondent has presented some evidence that she was the victim of spousal abuse, the Court, for a number of reasons, cannot find that there is any evidence that a return to Sweden would expose the *child*, who is the focus of the Convention, to a grave risk of harm. First, to the extent that any abuse did occur, it is evident that it will never occur again because the parties are now divorced. Upon a return to Sweden, Respondent would not be living with Petitioner any longer. As such, even if the Court were to accept the argument that the mere *witnessing* of marital abuse amounts to a grave risk of harm, the Court cannot accept that as a grounds for applying the affirmative defense.

More importantly, Respondent presented no evidence that Eden herself was the victim of any abuse. Not only was there no evidence that Petitioner has ever abused Eden, but there has not even been an *allegation* of that sort. Furthermore, evidence was presented that Petitioner had a healthy and loving relationship with Eden. Respondent even admitted on the witness stand that Petitioner always loved Eden. Any assertion that there is a risk, let alone a "grave" one, that Petitioner would harm Eden upon a return to Sweden lacks all credibility and, in fact, appears groundless.

Far from demonstrating by clear and convincing evidence that Eden would be exposed to a grave risk of harm, Respondent has not identified the exact harm to which she is referring. Respondent has failed to reach the high burden of establishing the defense and, as such, cannot rely upon it to prevent the Court's granting of the petition. *See Friedrich v.*

*Thompson*, 1999 U.S. Dist. LEXIS 21305, at \*19–20 (M.D.N.C.1999).

### B) *Acquiescence*

■ Article 13(a) provides an affirmative defense when Petitioner either consents to or later acquiesces to the removal of the child. This defense need only be established by a preponderance of the evidence. 42 U.S.C. § 11603(e)(2)(B). The Court fails to see how this defense would apply in this case. Respondent apparently wishes the Court to infer from the fact that Petitioner drove Eden and Respondent to the airport that he consented to Eden's removal. It is undisputed, however, that he thought she was going on vacation; that he thought she would return with the child after five weeks; and that it was not until Respondent was already in the U.S. that she informed him of her intention to never return. Respondent has failed to show that Petitioner consented or acquiesced to the removal. *See Whallon v. Lynn*, 230 F.3d 450, 461 (1st Cir.2000)(noting that cases to apply this defense usually find that there was a form of affirmative waiver by the non-abducting parent).

### C) *"Well–Settled" Defense*

In light of Eden's continuous and uninterrupted residence in the United States for the past three years, by far the most difficult issue presented in the case is whether Eden should not be returned under the "well-settled" defense to the Convention. The Court has the authority, pursuant to Article 12, to deny the petition if it finds that (a) the child is "well-settled" in her new environment, and (b) Petitioner initiated judicial proceedings under the

---

should take into account whether the courts of the home country would be able to protect the child from any alleged abuse. *See Miller,* 240 F.3d at 402–03. In *Miller,* the Court noted that even it proved true that the respon-

dent would prove a danger to her children, the Canadian courts would be able to ensure the safety of the child. Here, no showing has been made that the Swedish courts are unable to dutifully consider claims of child abuse.

Convention more than one year after the wrongful removal. Presuming that those two factors were established, the Court would then be called upon to determine whether any equitable justifications exist for tolling the one-year time period, treating the Article 12 exception as a statute of limitations. The determination whether equitable estoppel or tolling should apply to toll the one-year period must be made with reference to two competing interests found at the heart of the statute. On the one hand, it defeats the purpose of the Convention-which seeks to prevent the harmful effects of wrongful removal on children-to engender what would amount to a "second removal", uprooting the child from the place to which she has now developed ties. *See In re Robinson,* 983 F.Supp. 1339, 1346 (D.Colo.1997)("Nevertheless, the Convention has essentially decided that once settled in the new environment, to again uproot the child would be harmful."). On the other hand, courts must be wary of rewarding an abductor for concealing the whereabouts of a child long enough for the child to become "well-settled"; to reward the abductor as such would be to condone the exact behavior the Convention seeks to prevent. *See Bocquet v. Ouzid,* 225 F.Supp.2d 1337, 1348–49 (S.D.Fla.2002). It is with these competing principles in mind that the Court turns to the case at bar.

■ The Court first holds that Respondent has established the two elements that make up the Article 12 defense. The wrongful removal occurred in July 2000 when Eden was taken to the United States or shortly thereafter when Respondent informed Petitioner that she would not be returning to Sweden. From that moment, the one-year clock began to run. Petitioner did not file this action until March 18, 2003, well after the end of the one-year period. Petitioner has argued that because he contacted the Swedish Central Authority, he should be found to have act-

ed within the one-year period. This argument contradicts all of the courts to have touched upon the issue, who have uniformly held that the filing of a petition in the *courts* "commences" the judicial proceedings under the Convention. The two important dates, therefore, are the date of wrongful removal and the date the action was filed in the courts. *See Wojcik v. Wojcik,* 959 F.Supp. 413, 418–20 (E.D.Mich.1997)(citing the reasons why the filing of a court action is the action that commences judicial proceedings); *see also Mendez Lynch v. Mendez Lynch,* 220 F.Supp.2d 1347, 1362 (M.D.Fla.2002); *Zuker v. Andrews,* 2 F.Supp.2d 134 (D.Mass.1998); *Slagenweit v. Slagenweit,* 841 F.Supp. 264 (N.D.Iowa.1993). The filing of the action was clearly untimely.

■ The Court further finds that Eden is now "well-settled" in the United States within the meaning of the convention. Courts considering whether a child is well-settled can take into account numerous factors which can include: the circumstances surrounding the children's living environment; the stability of the child's residence in her new environment; social ties with family and friends; and attendance at school and other social institutions such as religious institutions. *See Mendez Lynch,* 220 F.Supp.2d at 1363; *Koc v. Koc,* 181 F.Supp.2d 136, 153 (E.D.N.Y.2001); *Zuker,* 2 F.Supp.2d at 141; *Bocquet,* 225 F.Supp.2d at 1349. One court has also noted that the age of the child can play into the court's analysis; at a certain age a child might be old enough "to allow meaningful connections to the new environment to evolve." *Robinson,* 983 F.Supp. at 1345–46. Another factor to consider is whether the abducting parent's efforts to conceal the child has caused the child to be moved from place to place. *See Lops v. Lops,* 140 F.3d 927, 946 (11th Cir.1998).

■ Guided by these factors, the Court concludes that Eden is now well-settled in the United States. At the time the petition was filed, she had lived in the United States for an uninterrupted period of over thirty months. She was enrolled in a local elementary school almost immediately upon arrival and she has now apparently just completed her third straight year at that school. Testimony of witnesses demonstrated that Eden has many friends at school and also in the apartment complex where she lives with her mother. She has also apparently lived at only one address since she moved to the United States. Even though Petitioner was not informed of the whereabouts of the child, there is nothing in the record to support a finding that Eden has been living a transitory life. Furthermore, at age nine, Eden is now old enough to experience meaningful ties with the United States. Based upon all of those facts, the Court finds that Eden is well-settled within the meaning of Article 12.

Having determined that Eden is "well-settled" and that the action was untimely filed nearly two and a half years after removal, the only remaining question is whether there are any equitable justifications to "toll" the running of the one-year period, thus causing the child to be returned in spite of the elements of the Article 12 defense having been established. The Court must first determine whether Article 12 is a statute of limitations, or if it is akin to one, so that equitable tolling could apply to it. If no equitable tolling would apply, then the child need not be returned. If equitable tolling does apply to Hague petitions, the Court must analyze whether the facts in this case warrant the use of equitable tolling.

It should be noted at the outset that neither the Convention nor ICARA specify that Article 12 should be subject to equitable tolling. Furthermore, although the Eleventh Circuit has mentioned the doctrine of equitable tolling as regards ICARA in passing, the Court has come upon no published or unpublished decision of any Court of Appeals, in the country which holds that equitable tolling applies to ICARA. Nevertheless, certain district courts, basing their holdings on policy considerations and on the belief that Congress must have intended ICARA to allow for tolling, have applied equitable tolling in Hague cases. Some of these courts have found that equitable tolling should apply to prevent a respondent from asserting the Article 12 defense. *Mendez Lynch*, 220 F.Supp.2d at 1362; *Bocquet*, 225 F.Supp.2d at 1348. Other courts analyzed whether equity demanded a return of the child but determined that tolling should not apply because the petitioners were not kept in the dark as to the location of the child. *Robinson*, 983 F.Supp. at 1345; *Wojcik*, 959 F.Supp. at 420–21 (no equitable reasons to toll).

While these courts have presented strong policy arguments for why tolling should apply to Hague Petitions, at least two courts have taken issue with the notion that the one-year period of Article 12 is a statute of limitations. These courts noted that the purpose of Article 12 is not to allow a plaintiff to have a reasonable amount of time to bring his or her claim. Rather, Article 12 represents the conviction of the drafters that even if a wrongful removal has occurred, it might be *worse* to order the child to be uprooted again after the passage of a certain amount of time. *See Toren v. Toren*, 26 F.Supp.2d 240, 244 (D.Mass.1998), *vac'd on other grounds*, 191 F.3d 23 (1st Cir.1999). Another court put it this way:

> [T]his court is not convinced that the one-year period referred to in Article 12 is a statute of limitations. A petition for the return of a child is not barred if it is filed over one year from the date of removal. Rather, the drafters of the

Hague Convention decided that after the passage of a year, it became a reasonable possibility that the child could be harmed by its removal from an environment into which the child has become settled, and that a court ought to be allowed to consider this factor in making the decision whether to order the child's return.

*Anderson v. Acree,* 250 F.Supp.2d 872, at 875, 2002 U.S. Dist. LEXIS 26358, at *6 (S.D.Ohio 2002).

■ The court agrees with *Anderson* to the extent that it identifies the intentions of the drafters to allow courts to take into account the child's circumstances (after the passage of time) when deciding whether to order a return. The Court believes, however, that courts faced with the present situation, where the actions of the abductor in concealing the child may have abetted the child in forming roots in the new country, must have the flexibility to take into account those actions in determining the outcome of the case under Article 12. While Article 12 may not be a statute of limitations per se, it should be subject to

some form of equitable tolling for the exact policy reasons enunciated in the cases where courts have "tolled" the Convention.[4] A rule that stated that a court considering a Hague petition *cannot* return a child if the "abducting" parent has established the elements of Article 12 would create a perverse incentive for abducting parents. Such a rule would inevitably result in scenarios where abducting parents, hoping to avoid the mandates of the Convention, attempt to conceal the child from the non-abducting parent for more than one year. Then, if hailed into court on a Hague petition (presuming the non-abducting parent could *ever* locate the child), the abducting parent would have achieved what amounts to an immunity from the Convention. The purposes of the Convention would be directly controverted were parents allowed to circumvent the Convention's strictures by fleeing from the law. The Court cannot condone such a result.

■ Applying equitable principles in theory is easier than applying them in practice as this case demonstrates.[5] The

---

**4.** Even courts that have refused to order the return of a child based on the Article 12 defense have noted that concealment of a child might prevent the abducting parent from relying on that defense:

> Certainly, passage of time should not give advantage to the abductor who conceals the child or *seeks to avoid process* but that is not the case here. The uncontroverted testimony shows the petitioner always knew the location of the children and, in fact, visited them in Colorado. Accordingly, there is no basis for some sort of equitable tolling to preclude the application of Article 12's terms.

*Robinson,* 983 F.Supp. at 1345 (emphasis added).

**5.** For the sake of clarity, the Court notes that while other courts have used the term "equitable tolling" when considering Article 12, the more appropriate terminology, at least in this Circuit, is probably "equitable estoppel". *See C.M. English v. Pabst Brewing Co.,* 828 F.2d

1047 (4th Cir.1987), *cert. denied,* 486 U.S. 1044, 108 S.Ct. 2037, 100 L.Ed.2d 621 (1988). "Equitable tolling applies where the defendant has wrongfully deceived or misled the plaintiff in order *to conceal the existence of a cause of action." Id.* a 1049 (emphasis added). Here, there was no concealment of the cause of action; to the contrary, Respondent phoned Petitioner within weeks to inform him that she would not be returning. The injury was then readily apparent to Petitioner. Equitable estoppel, on the other hand, "applies where, despite the plaintiff's knowledge of the facts, the defendant engages in intentional misconduct to cause the plaintiff to miss the filing the deadline." *Id.* Equitable estoppel appears more *apropos* in the current action because Petitioner's argument is that Respondent acted affirmatively to prevent Petitioner from suing in time. What is troubling for the Court is that "equitable estoppel" has never apparently been applied in the Hague context. And to the extent that an

Court has wrestled with the ramifications of ordering a return of the child in the face of evidence that she is now "well-settled" in the United States, after now nearly three years of residence. That notwithstanding, the Court feels compelled to conclude that because Respondent took affirmative steps (a fact corroborated by all the evidence) to conceal from Petitioner the location of Eden (making it impossible for him to file his Hague petition), equity must be applied to overcome Respondent's Article 12 argument. If the Court were to allow the Article 12 defense to apply in a case such as this, it would essentially be condoning the behavior that the treaty specifically seeks to mete out.

The evidence demonstrates that after removal, Respondent contacted Petitioner to inform him that she would not be returning with the child. She purposefully revealed no information about the location of herself or of Eden. There is no indication that Petitioner had any information about the whereabouts of the child, above and beyond the city listed on the plane ticket. Within four months he traveled to the United States. It is undisputed that Respondent removed Eden from Maryland during that time with the knowledge that he would be arriving in the area. Witnesses for Respondent testified that they would not reveal to Petitioner the location of the child.[6]

The record is murky as to the actions taken by Petitioner during the year of 2001, though he did file an application with the Central Authority in Sweden. Had Respondent presented evidence that during this time Petitioner became aware of the address of the child, the result in the case might have been different. But the only evidence on the record details Respondent's concerted efforts to conceal Eden from her father. Petitioner again came to the United States at the end of 2001 and again was not informed of the location of the child. He was picked up and driven to an unknown residence where he has the opportunity to see Eden for only 15 minutes.

He then returned to Sweden, still without knowledge as to the location of his daughter. While the evidence indicates that NCMEC had found the location of the child, there is nothing in the record to support the idea that it passed that information on to Petitioner. For all of 2002, no evidence shows that he came to learn the location of Eden. It was not until February of 2003 that Petitioner was finally informed. Within a month of learning of Eden's location, he brought the petition.

The Court must conclude that Respondent must be equitably estopped from asserting the Article 12 defense until Petitioner, through his own efforts, independently discovered Eden's location. It appears that Respondent's efforts to conceal the child's whereabouts were successful until February 2003. After learning of child's location-and the Court has no reason to believe that Petitioner had that information prior to February 2003-he acted expeditiously to enforce his rights under the Hague Convention. Petitioner can not be faulted for the delay that was Respondent's own causing.

---

"intent" to avoid Hague prosecution is a necessary element in equitable estoppel, the Court has questions as to whether Petitioner has met that burden. Without further guidance on the issue, however, the Court concludes more generally that the concealment of the child is the type of affirmative misconduct which "equitable estoppel" encompasses.

**6.** The Court understands that looming over Respondent's decision was a history of abuse. But other than the exceptions listed in the Treaty, the Treaty makes no allowance for "self-help". It is the apparent intention of the Treaty to demand that parents rely upon the courts and the laws of the local country (in this case Sweden) to resolve any disputes between the parties.

This is not the case where a parent has "slept" on his rights, allowing time to pass without actively seeking the child.[7] Instead, when knowledge came to him as to Eden's location, he acted with due haste in bringing the petition. Because Respondent concealed the child from Petitioner until February of 2003, she is estopped from asserting the Article 12 defense.

## V. CONCLUSION

Petitioner has conclusively established that Respondent "wrongfully removed" Eden from Sweden within the meaning of the Hague Convention. Although the child is now "well-settled" in the new environment and more than one-year has passed between the wrongful removal and the filing of the petition, the Court finds that all of the equities demand that Respondent not benefit from the protective sweep of Article 12. The Court, therefore, concludes that, there being no affirmative defense to prevent return, it should be up to the Swedish courts to determine the proper custody and/or visitation arrangements for Eden.[8] The Court has deliberated thoroughly on this Petition with a mind to the potentially harmful disruption this Court's Order may have on the child who probably has suffered the most from her parent's disputes. The Court does not wish to "uproot" the child from a place where she is now "well-settled". But any concern about uprooting the child must be weighed against the legitimate concern that allowing Respondent's behavior to go unchecked could provide incentive to parents to take the law into their own hands, crossing international borders in search of more sympathetic custody courts. The Hague Convention, implemented by ICARA, expressly seeks to prevent such actions. An Order consistent with this Opinion and detailing the procedures for the return of Eden with Respondent will follow.

### ORDER

For the reasons stated in the accompanying Memorandum Opinion dated July 8th, 2003, IT IS this 8th day of July, 2003, by the United States District Court for the District of Maryland, hereby **ORDERED** that:

1. The Petition for the Return of Child filed by Tesfaie Belay [1] BE, and the same hereby IS, **GRANTED**;

2. Tsion Getachew return to Sweden with the child, Eden Belay, no later than thirty (30) days from the entry of this Order;

3. Eden Belay remain in the custody of Tsion Getachew until the time of their departure;

4. Tsion Getachew, upon her return to Sweden, immediately submit to the Swedish Court with jurisdiction over family matters for resolution of any custody and/or visitation issues;

---

7. As already stated, the Court's analysis might have been altered had Respondent proffered evidence tending to show that Petitioner had the address at some earlier point in time. Without any such evidence, the Court is left to infer that Petitioner did not learn the address until February 2003. He then acted diligently to bring the petition.

8. The Court notes that upon review of the case, the Swedish Court could conceivably consider a custody arrangement that would allow for the return of Respondent and Eden to the United States with visitation rights for the father. In any event, the record indicates that Eden, who has just finished her third straight year in elementary school, is currently on summer recess. Respondent, upon her return to Sweden, should act with due haste to have the proper Swedish authorities make the custody and/or visitation determination so that in the event the Court in Sweden decides that Eden's return to the United States in the custody of her mother would be appropriate, Eden could return in time to be present for the start of the school year.

5. The passports of Eden Belay and Tsion Getachew are to remain in the custody of the Clerk of the Court up and until Respondent proffers to the Court evidence that she has purchased a return ticket to Sweden for herself and for Eden;

6. That any and all remaining pending motions BE, and the same hereby ARE, deemed **MOOT**;

7. That the Clerk of the Court CLOSE the case;

8. That the Clerk of the Court transmit copies of this Order to all counsel of record;