**Christian VAN DRIESSCHE,**
**Petitioner,**

**v.**

**Bibiana OHIO–ESEZEOBOH, a/k/a Bibiana Ohio, Bibiana Smith, Viviana O Esezeobo, Viviana Ohio, Bibiana Esezeobo, Respondent.**

**Misc. Action No. H–06–220.**

United States District Court,
S.D. Texas,
Houston Division.

Dec. 12, 2006.

John K. Grubb, Cindy M. Aguirre, John K. Grubb & Associates, Houston, TX, for Plaintiff Christian Van Driessche.

Stewart W. Gagnon, Jennifer Lynn Zucker, Fulbright & Jaworski L.L.P., Houston, TX, for Defendant Bibiana Ohio–Esezeoboh.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

HITTNER, District Judge.

On August 25, 2006 and October 3, 2006, the Court conducted a non-jury trial on the above-referenced matter. The Court has reviewed the evidence, the post-trial sub-

missions of the parties, and the applicable law. The Court now enters the following findings of fact and conclusions of law. Any finding of fact that should be construed as a conclusion of law is hereby adopted as such. Any conclusion of law that should be construed as a finding of fact is hereby adopted as such.

### FINDINGS OF FACT

1. Petitioner Christian Van Driessche ("Van Driessche") filed a petition ("Hague Petition") for the return of his child, Melissa, to Belgium pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, October 25, 1980, T.I.A.S. No. 11670, 1988 WL 411501 ("Hague Convention" or "Convention") *reprinted in* 51 Fed.Reg. 10,494 (March 26, 1986); and the International Child Abduction Remedies Act, 42 U.S.C.A. § 11601, *et seq.* ("ICARA").

2. Van Driessche, a Belgian citizen, alleges his child Melissa was wrongfully removed from Belgium to Houston, Texas ("Houston"). He contends she must be returned to Belgium pursuant to the Hague Convention and ICARA.

3. Respondent Bibiana Ohio–Esezeoboh Smith ("Smith"), Melissa's mother, is a Nigerian citizen living in Houston. Smith contests the applicability of the Convention, denies she wrongfully removed Melissa from Belgium under the Hague Convention, asserts affirmative defenses to wrongful removal, and opposes the petition to remove Melissa to Belgium.

4. Van Driessche, who is employed by the Belgian government in the Ministry of Foreign Affairs, was posted to Nigeria in 1996.

5. At that time, Smith lived in Nigeria and worked as an actress in TV and radio programs and raised exotic dogs.

6. In February 1999, when Van Driessche was stationed in Nigeria, Van Driessche and Smith met at a social function. He was married, but he and his wife were separated.[1]

7. In the spring of 1999, Van Driessche and Smith began dating.

8. During the summer of 1999, Smith abandoned her apartment, sold her furniture, and began living with Van Driessche, but maintained her bank accounts and continued working.

9. In September 1999, Smith and Van Driessche discovered Smith was pregnant.

10. Van Driessche and Smith agreed the child should be born in the United States.

11. Accordingly, in February 2000, Smith traveled from Nigeria to Chicago, Illinois ("Chicago") to visit her sister, Catherine Albee ("Catherine"), and to await the infant's birth.

12. Smith's delivery due date was April 15, 2000, and Van Driessche was scheduled to arrive in Chicago on April 12, 2000, to participate in the infant's birth.

13. Smith paid for insurance in the United States for the medical costs associated with the birth, and Van Driessche paid for Smith's round-trip airfare from Nigeria to Chicago.

14. The infant, Melissa, arrived several days early, on April 10, 2000, before Van Driessche arrived in Chicago.

15. On April 14, 2000, subsequent to his arrival in Chicago, Van Driessche signed a Voluntary Acknowledgment of Paternity.

16. After the infant's birth, Van Driessche spent two weeks in Chicago and then returned to Belgium. Smith re-

---

1. Van Driessche and his wife officially divorced in 2002.

mained in Chicago for approximately two more weeks.

17. While in Chicago, Melissa received her current United States social security number.

18. In May 2000, Smith returned to Nigeria with Melissa.

19. Sometime in July 2000, Smith and three-month-old Melissa traveled from Nigeria to Chicago to attend Catherine's wedding.

20. In October 2000, the Ministry of Foreign Affairs recalled Van Driessche to Belgium.

21. Consequently, Van Driessche, Smith, and Melissa traveled to Belgium. Smith traveled there under a tourist visa, and, as a United States citizen, Melissa did not need a visa to enter Belgium. Smith testified that, at some point in their relationship, she and Van Driessche planned to get married.

22. When Smith left Nigeria with Van Driessche, she retained her Nigerian bank accounts but sold her car, closed her business, and gave away most of her dogs.

23. Smith testified that she had to leave Belgium frequently in order to retain her visa.

24. Upon arriving in Belgium, Smith and Melissa lived with Van Driessche in a smaller apartment inside his larger home, located at Avenue Georges Henri, 439, 1200 Brussels, which Van Driessche owned and had been in his family since the early 1950's.

25. In January 2001, four months after arriving in Belgium, Smith alleges she and nine-month-old Melissa left Belgium and moved to Catherine's home in Houston due to Van Driessche's violent and abusive nature. Catherine had relocated from Chicago to Houston by this time.

26. In February 2001, Van Driessche flew to Houston, which Smith alleges was for the purpose of convincing her to return to Belgium.

27. During his Houston visit, Van Driessche stayed at Catherine's home, visited the Galleria Mall, and toured Galveston, Texas and New Orleans, Louisiana with Smith.

28. In February 2001, Smith and Melissa returned to Belgium with Van Driessche.

29. After returning to Belgium in February 2001, Melissa attended a daycare near Van Driessche's home.

30. Van Driessche testified that Melissa had many relatives in Belgium, including Van Driessche's two older sons; his brother and his family; and his sister and her family.

31. Smith testified that she was held against her wishes in Belgium from May 2001 through December 2001 because she had no resources to leave.

32. At some point in 2001, Smith broke off the engagement.

33. By December 2001, when Melissa was almost twenty months old, the relationship between Van Driessche and Smith had further deteriorated.

34. On December 10, 2001, Van Driessche sent Smith an email stating: "Of course I asked [you] to follow me in Belgium when you had decided to go to the US; I would also prefer to be in the U.S. and I'm working hard on that; and I know I've done stupid things but this was under particular circonstances [sic] of stress and drinking."

35. Van Driessche and Smith disagree about the nature of the "stupid things" he

had done.[2]

36. Van Driessche testified that while Smith was in Belgium, she often went out at night and left nine-month-old Melissa with him. As a result, Van Driessche had to get the baby ready for daycare in the morning without Smith's help. This was a point of friction between them.

37. On December 31, 2001, Smith and Van Driessche had an argument.[3]

38. After the argument, Van Driessche drove Melissa to his sister's home in Marbais, Belgium, about 40 kilometers (or 25 miles) away.

39. Smith filed a police report, claiming Van Driessche attacked her while he was drunk and took Melissa away. Van Driessche also filed a police report.

40. The police required Smith to surrender Melissa's passport. The police gave it to Van Driessche, who still has it.[4]

41. After the fight on December 31, 2001, Smith stayed with a friend because she had no place to live, no money, and no source of income.[5]

42. On December 31, the Belgian juvenile authorities became involved and allowed Van Driessche to keep the infant for approximately twenty-five days.[6]

43. In January 2002, Van Driessche instituted proceedings in the juvenile court for exclusive parental authority over Melissa and filed custody proceedings in the Brussels Court of First Instance ("Belgian court").[7]

44. On January 31, 2002, Van Driessche filed a "unilateral petition" and the judge ordered that Smith could not place Melissa's name in her passport, obtain a passport for Melissa, or leave the Belgian territory with Melissa without Van Driessche's consent.[8]

45. The Belgian court held a hearing on Van Driessche's petition on March 11,

**2.** Smith testified his stress related to an investigation in Belgium concerning his involvement in human trafficking and money laundering.

**3.** Smith contends Van Driessche came home drunk, attacked her, beat her, and smeared dog excrement on her. In opposition, Van Driessche testified Smith did not keep the house as clean as he liked it, and he confronted Smith about dog excrement that he found on the bed sheets, telling her that it was unacceptable.

**4.** Van Driessche contends the police gave Melissa's passport to him because they feared Smith would flee Belgium with Melissa. The Belgian court subsequently noted that both sides filed complaints relating to fears of parental seizure, child abduction, and refusal to present the child.

**5.** Smith testified that none of Van Driessche's relatives offered to provide her with a place to stay or any other assistance.

**6.** From the December 31, 2001 argument until the March 11, 2002 hearing, Melissa spent some time with each parent. However, this period of time was acrimonious, with both parents accusing the other of secreting Melissa. Smith contends that when Melissa was returned to her, Melissa had developed a fear of abandonment, which provoked screaming, crying spells, panic and vomiting every time Smith left the room. Van Driessche claims Smith took Melissa from him on January 30, 2002, in spite of the Juvenile Public Prosecutor's entrusting Melissa to her father.

**7.** The record is unclear whether Van Driessche filed one petition in juvenile court and another in the Brussels Court of First Instance, or whether the subsequent hearings held in the Brussels Court of First Instance were a continuation of the juvenile court proceedings.

**8.** A subsequent court order states that Van Driessche filed the unilateral petition on January 31, 2002, but does not indicate whether Smith was served with process, had notice of any proceedings prior to the subsequent March 11, 2002 hearing, or had notice of the Belgian court's January 31, 2002, order.

2002, either as a result of the petition filed in juvenile court or as a result of a subsequent petition filed in the Court of First Instance.

46. The proceeding was held in French, which Smith does not understand, but she was represented by a pro bono attorney. Smith attended the hearing with a friend who attempted to translate the proceedings from French to English for her because there was no translator present at the hearing.

47. The Belgian court stated that parental rights must be established under Illinois law. Because Van Driessche had not presented any applicable Illinois law, the Belgian court deferred adjudicating his parental rights and ordered that the hearing resume on April 22, 2002.

48. Additionally, the Belgian court provisionally declared on March 11, 2002 ("March 11 Order") that Smith would keep Melissa one week and Van Driessche would keep Melissa the other week.[9]

49. However, the Belgian court also provisionally ordered that Smith had custody of Melissa, except the time Melissa was staying with her father, and that Melissa was to be registered in the population registers at her mother's residence.[10]

50. The Belgian court also ordered Van Driessche to pay Smith 165 euros per month for Melissa's maintenance. Van Driessche never paid any money for Melissa's maintenance.

51. Smith avers that she cannot understand French and that she did not know that the Belgian court ordered the proceedings to resume on April 22, 2002. Moreover, Smith avers she was never a Belgian resident because she only entered Belgium on a tourist visa.

52. She further avers that, based on her friend's translation, she believed that the court matter was over and that, because Van Driessche had no parental or custody rights, she was free to leave Belgium with Melissa.

53. In compliance with the March 11 Order, Van Driessche kept twenty-three month-old Melissa for his week. When he returned Melissa to Smith, she took Melissa out of Belgium.

54. Smith first went to Italy, where she received assistance from the International Organization for Migration ("IOM"), an organization that provides humanitarian assistance to migrants in need. IOM assisted Smith and Melissa in returning to her parents' home in Nigeria, where they arrived in April 2002.

55. Van Driessche testified that he contacted and continually worked with the Belgian police to locate Melissa after Smith left the country.

56. At the Belgian court's April 22, 2002, hearing, Van Driessche submitted a copy of the Voluntary Acknowledgment of Paternity he had signed in Chicago. Having determined that Van Driessche had parental rights, the Belgian court issued another interim order, granting Van Driessche "exclusive parental authority."[11] Smith was not present at the hearing.

---

9. Although Smith alleged Van Driessche had a drinking problem, the Belgian court found that Smith's allegations that Van Driessche had a drinking problem were "not compatible with his personality, his professional career, and the care given to the child."

10. Apparently, because the Belgian court granted Van Driessche a "right of personal relations," he had visitation rights rather than custody rights. On the other hand, because Melissa was "entrusted to" her mother and was to be "registered in the population registers at her mother's residence," Smith had custody rights.

11. Apparently, the Belgian court granted Van Driessche sole custody of Melissa at the April 22, 2002 hearing.

57. Additionally, the Belgian court re-urged the prior order that Smith be banned from placing the name of the child in her passport, from having a passport issued in Melissa's name, and from leaving the Belgian territory with Melissa without the express consent of Van Driessche.

58. Six months after leaving Belgium, in September 2002, Smith traveled from Nigeria to Catherine's Houston home without Melissa, who was then two and a half years old, in order to prepare for a permanent move to Houston with Melissa.

59. In September and October 2002, Smith and Van Driessche corresponded by email. Based upon Smith's reference to the "Galleria on Westheimer," Van Driessche asked Smith if she was in Houston and asked if he could see Smith and Melissa there.

60. Pursuant to the letter rogatory submitted to the United States government concerning Smith, the parties agreed to arrange a meeting in Houston on October 13, 2002, but the meeting never took place.[12]

61. In November 2002, Smith left Nigeria with Melissa and traveled to Houston, via Mexico City, Mexico and Laredo, Texas using Melissa's Illinois birth certificate to bring Melissa into the United States.

62. On November 22, 2002, Smith and Melissa moved in with Catherine, who resided at 21526 Bowcreek Lane, Katy, Texas 77449, where they lived for the next two years.

63. In 2002 or early 2003, Melissa obtained from the Texas Department of Pub-

lic Safety an Under 21 Identification Card ("ID"). The ID card was in the name of Melissa Van Driessche and reflected her address at 21526 Bowcreek Lane, Katy, Texas 77449.

64. Smith received a valid Texas driver's license in 2002 under her correct name and using her correct Bowcreek Lane address. Sometime in 2002, Smith also began the process of procuring her green card. Throughout the immigration process, the Department of Homeland Security, Citizenship and Immigration Services sent information to Smith at her correct mailing address.

65. On December 18, 2002, the Belgian court issued a final default judgment. The judgment awarded Van Driessche sole custody of Melissa, ordered that her main residence was her father's home, and ordered her to be registered in the Belgian population registers at his address. The Belgian court determined that it had international jurisdiction over Smith because Smith resided in Belgium at the time the petition was filed, ordered Smith to repatriate the child to Belgium, and authorized Van Driessche to use the police if necessary to effect Melissa's return.

66. On March 29, 2003, Smith married Anthony Smith ("Anthony"), and the couple resided at Bowcreek Lane.

67. Anthony submitted a permanent resident visa petition on Smith's behalf on June 10, 2003, but Anthony's petition was withdrawn.[13] Smith's marriage to Anthony ended in divorce, which was final on June 5, 2005.

---

**12.** *See infra* notes 14, 16.

**13.** Smith testified that Anthony was abusive to her and had a drinking problem. In addition, she testified that after she was married, she and Anthony applied to change her resi-

dent status. However, because Anthony withdrew her application for permanent resident status, Smith sought and was granted her permanent residence status under the provisions of the Violence Against Women Act.

68. Smith received her green card in March 2006 and is now a permanent resident of the United States.

69. In emails exchanged in April and June 2004, Smith and Van Driessche discussed setting up visitation arrangements, although none took place. By this time, Smith and Melissa had been gone from Belgium for more than two years.

70. In August 2004, Melissa began school at age 4 at Golbow Elementary School in Katy, Texas, where she was enrolled using her legal name, Melissa Van Driessche, and her accurate social security number.

71. In September 2004, two and a half years after Smith and Melissa left Belgium, Van Driessche's government submitted a letter rogatory on his behalf, dated August 30, 2004 ("August 2004 letter"), to the United States Office of International Affairs. The August 2004 letter, which outlined the factual history at issue in the case at bar, requested assistance in the criminal matter of Smith, who was suspected of child abduction in violation of Article 432, § 1 of the Belgian Penal Code. Moreover, the August 2004 letter stated that because Smith has close contacts with her sister in Houston, "it would be advisable to check whether Ohio Esezeobo Bibiana [Smith] and her girl would be staying on

American soil." Consequently, it requested the United States authorities to seek evidence of Smith's whereabouts by interviewing her sister Catherine and searching her home in Houston.[14]

72. Although the August 2004 letter requested the authorities to look for Smith by seeking information from her sister in the Southern District of Texas, no Hague Petition was filed by Van Driessche—or by his government on his behalf—at this time.[15]

73. On December 17, 2004, this Court issued an Order ("2004 Order") directing the United States Attorney's Office to execute the Belgian government's requests that were set forth in the August 2004 letter. The Federal Bureau of Investigation ("FBI") subsequently initiated an investigation to carry out these requests.[16]

74. In February 2005, when Melissa was almost five, Melissa, Smith, and Catherine moved to 801 Country Place Drive, Houston, Texas, but Melissa finished the school year at Galbow Elementary School.

75. On or about March 21, 2005, Smith and Van Driessche corresponded by email about his sending money to help support Melissa. In response to a question about where to send the money, Smith respond-

14. The Belgian Court sent the letter rogatory, dated August 30, 2004, to the United States Office of International Affairs in Washington, D.C. Thereafter, the United States government filed an *Ex Parte* Application for Order Pursuant to 28 U.S.C. § 1782 (*"Ex Parte* Application") under seal on December 17, 2004, in the Southern District of Texas. It is Miscellaneous Action H–04–406.

15. Van Driessche is still employed by the Belgian Ministry of Foreign Affairs.

16. The August 2004 letter and this Court's corresponding 2004 Order were specifically brought to the attention of the Court after the October 3, 2006 hearing. Because the *Ex*

*Parte* Application was filed under seal and this information was not disclosed at any time during the instant Hague Petition proceedings, the Court, *sua sponte*, provided Notice of the August 2004 letter and 2004 Order to both parties on October 13, 2006 (Document No. 16). Neither party subsequently requested a hearing or any other additional proceedings in connection with the Belgian government's letter rogatory, this Court's 2004 Order, or the FBI's subsequent investigation. However, Van Driessche requested that the Court supplement his exhibits in the instant action with any documents on file that were obtained as a result of the *Ex Parte* Application.

ed, "To Houston, you know how western union works."

76. On April 20, 2005, four months after the 2004 Order, Van Driessche was advised by the FBI that it had located Smith and Melissa. The FBI indicated that the National Center for Missing and Exploited Children ("NCME") would help Van Driessche file a Hague petition and find an attorney.

77. On May 11, 2005, the Belgian Central Authority drafted documents for Van Driessche to seek Melissa's return through a Hague Convention Petition. More than three years had passed since Smith left Belgium with Melissa.

78. On July 20, 2005, Van Driessche authorized the Belgian Central Authority to take measures on his behalf to secure Melissa's return to Belgium.

79. In August 2005, Melissa enrolled in kindergarten at Thornwood Elementary School, where she was enrolled using her correct legal name and accurate social security number. She is now in first grade at Thornwood.

80. In November 2005, Melissa obtained an identification card from the NCME.

81. Melissa is now six years old and has been residing in Houston for the past four years, since November 2002.

82. Melissa attends school in Houston, where she participates in drama and art classes, and attends church regularly with her mother.

83. All of Melissa's friends are located at her school, neighborhood, and church in Houston.

84. Melissa's adult support system includes her mother, her aunt Catherine, and another adult friend, Rebecca Lopez.

85. Melissa speaks English; she does not speak French.

86. On June 5, 2006, more than a year after he authorized the Belgian Central Authority to seek Melissa's return, Van Driessche filed the instant petition.

87. In July 2006, Smith and Melissa moved to 9850 Meadowglen Lane, Apartment 188, Houston, Texas 77042.

88. Van Driessche testified that he did not know where Melissa was at any time after Melissa left, but acknowledged that he never called Smith's parents, who knew where she was. He also never attempted, through public information channels, to find Catherine's phone number, which is not unlisted, but only contacted the local Belgian police to find Melissa.

89. Van Driessche testified that he thought Melissa was well-settled in Houston.

90. Adult friends Kimber Kane and Rebecca Lopez testified Melissa is well-settled in Houston.

91. The parties agree that Smith did not advise Van Driessche of the address where Smith was living, but that they only communicated by email.

## CONCLUSIONS OF LAW

### Hague Convention and ICARA

92. "The Hague Convention establishes legal rights and procedures for the prompt return of children who have been wrongfully removed or retained." § 11601(a)(4). It was implemented into law in the United States by ICARA, which supplements the Convention rules. § 11601(b)(2).

93. The purpose of the Convention is to protect children from the harmful effects of wrongful removal, to establish procedures for their prompt return, and to secure protection for rights of access. Hague Convention, at preamble.

94. Although the Convention uses forceful terms like "abduction," the drafters were primarily concerned with securing international cooperation regarding returning children wrongfully taken by a parent from one country to another in search of a more sympathetic court. *Gonzalez v. Gutierrez*, 311 F.3d 942, 944 (9th Cir.2002).

■ 95. The Convention and ICARA empower courts to determine only the merits of a wrongful removal claim under the Convention, not the merits of any underlying child custody claims. ICARA § 11601(b)(4); *Lops v. Lops*, 140 F.3d 927, 936 (11th Cir.1998).

96. The Convention sets forth the circumstances under which a petitioner may avail himself of its provisions mandating a child's return. *Furnes v. Reeves*, 362 F.3d 702, 710 (11th Cir.2004) (citing Hague Convention, arts. 3, 5, 12, 13).

■ 97. The general rule under the Convention is that the child's return to the country of his habitual residence is mandatory if the child's removal was in breach of the other parent's custody rights. Hague Convention, art. 12; *Feder v. Evans–Feder*, 63 F.3d 217, 221 (3d Cir.1995).

98. Once the petitioner establishes that the respondent wrongfully removed the child from his habitual residence, the child must be returned unless the respondent can establish one of four defenses. *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir.1996).

■ 99. Two defenses must be established by clear and convincing evidence: (1) there is a grave risk that the return of the child would expose him or her to physical or psychological harm; or (2) the return of the child would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms. *Id.* (citations omitted).

100. Two other defenses must be established by a preponderance of the evidence: (1) the proceeding was commenced more than one year after the removal of the child, and the child has become settled in his or her new environment; or (2) the person seeking return of the child consented to or acquiesced in the removal or retention. *Id.* (citations omitted).[17]

## A. WRONGFUL REMOVAL

■ 101. Initially, a petitioner bears the burden to prove, by a preponderance of the evidence, that the child's removal was wrongful within the meaning of the Hague Convention. *Bader v. Kramer*, 445 F.3d 346, 349 (4th Cir.2006) (citing 42 U.S.C. § 11603(e)(1)).

■ 102. Under the Hague Convention, a petitioner shows that a child's removal was "wrongful" by demonstrating that (1) the child was "habitually resident" in the petitioner's country of residence at the time of removal, (2) the removal was in breach of petitioner's custody rights under the law of his home State, and (3) the petitioner had been exercising those rights at the time of removal.[18] *Id.; Humphrey*

---

17. All four defenses are narrow and are not a basis for avoiding return of the child merely because an American court believes it can better or more quickly resolve a dispute. *Friedrich*, 78 F.3d at 1067. Furthermore, a court should exercise its discretion to return the child despite a defense if the return would further the aims of the Convention. *Id.* (citations omitted).

18. Article 3 provides in relevant part: The removal or the retention of a child is to be considered wrongful where—(a) it is in breach of rights of custody attributed to a person ... under the law of the State in which the child was habitually resident immediately before the removal or retention; and (b) at the time of removal or retention those rights were actually exercised, ... or would

v. Humphrey, 434 F.3d 243, 246 (4th Cir. 2006); Ruiz v. Tenorio, 392 F.3d 1247, 1251 (11th Cir.2004).

103. Thus, the Court must determine whether Van Driessche has shown by a preponderance of the evidence that Melissa was wrongfully removed from Belgium.

### 1. Habitual residence

104. To meet the first element of wrongful removal, Van Driessche must show Melissa was habitually resident in Belgium at the time of her removal. Bader, 445 F.3d at 349. A child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective. Feder, 63 F.3d at 224.

105. However, when a child is too young to have an intent regarding habitual residence, the inquiry becomes "shared parental intent." In re Application of Adan, 437 F.3d 381, 392 (3d Cir.2006); Whiting v. Krassner, 391 F.3d 540, 547–48 (3d Cir. 2004).

106. The Court must consider all available evidence to determine the shared parental intent at the time of removal.[19] Mozes v. Mozes, 239 F.3d 1067, 1076 (9th Cir.2001).

107. The Court notes that the unique circumstances of each case must be considered when inquiring into a child's habitual residence. Holder v. Holder, 392 F.3d

1009, 1016 (9th Cir.2004); accord Ruiz, 392 F.3d at 1252 (adopting the court's analysis of habitual residence in Mozes v. Mozes, 239 F.3d 1067 (9th Cir.2001) as its own).

108. To establish a habitual residence, there must be a settled intention to abandon the residence left behind and an actual change in geography for a period of time that is sufficient for acclimatization. Mozes, 239 F.3d at 1078; Holder, 392 F.3d at 1018.

109. In the instant action, Smith testified that she abandoned her apartment in Nigeria when she moved in with Van Driessche at his Nigerian residence and that she sold her car when they moved to Belgium. She acknowledged that they intended to get married and that she lived in Van Driessche's residence while she was in Belgium. While in Belgium, Smith and Van Driessche agreed to place Melissa in a daycare in order for Smith to have more free time and to enable Melissa to develop social skills.

110. Under these circumstances, the Court concludes that Smith had a settled intention to abandon Nigeria because she had no residence or car remaining there when she left for Belgium; she had an actual change in geography by traveling to Belgium; and the time she spent in Belgium, from October 2000 until March 2001, was a sufficient period of time for acclimatization for both Smith and Melissa. Thus, the Court concludes Smith had a shared parental intent to habitually reside in Bel-

---

have been so exercised but for the removal or retention. Hague Convention, art. 3.

19. Courts refined their initial approach of looking at habitual residence from the child's perspective, because children "normally lack the material and psychological wherewithal to decide where they will reside." Mozes, 239 F.3d at 1076. In these cases, it is the intent of the person or persons entitled to fix the

child's place of residence that the court should consider, rather than the degree of settled purpose from the child's perspective. Id. However, an analysis of shared parental intent, in hindsight, is difficult because the persons who were entitled to fix the child's residence at the time of the removal often no longer agree on the locus of the child's habitual residence. See id.

gium, and Belgium was Melissa's habitual residence at the time of her removal.

## 2. Breach of Custody Rights

111. In addition to proving that Belgium is the child's habitual residence, Van Driessche must prove Melissa's removal was in breach of his custody rights under Belgian law. *Bader*, 445 F.3d at 349. The Court notes that pursuant to Belgian law, Van Driessche must prove Melissa's removal was in breach of his custody rights under Illinois law.

112. Van Driessche argues the Belgian court ordered Smith to remain in Belgium and, after she left, the Belgian court granted him sole custody of Melissa. He argues this Court must accord full faith and credit to the acts, deeds, and orders of the Belgian court, pursuant to 42 U.S.C. § 11603(g), and return the child.

113. In contrast, Smith argues the March 11 Order, which was in effect at the time she left Belgium, supports her position that Van Driessche has no custody rights under the Convention because the March 11 Order only granted him a right of personal relations with Melissa, not a right of custody. Smith reasons that because Van Driessche had not established his parental authority over Melissa before she left Belgium, he could not have custody rights within the meaning of the Convention, and thus, she did not breach his custody rights when she removed Melissa from Belgium.

114. Under 42 U.S.C. § 11603(g), "[f]ull faith and credit shall be accorded by the courts of the States and the courts of the United States to the judgment of any other such court *ordering or denying the return of a child, pursuant to the Conven-*

*tion*, in an action brought under this chapter." (emphasis added).

115. As a general matter, judgments rendered in a foreign nation are not entitled to the protection of full faith and credit. *Diorinou v. Mezitis*, 237 F.3d 133, 142 (2d Cir.2001) (citing Restatement (Second) of Conflict of Laws § 98 cmt. b (1971)). Moreover, legislative history indicates the full faith and credit provision of ICARA only applies to United States court orders and judgments regarding a Hague petition. *Id.* As a result, a Hague petition adjudication in another country is not entitled to full faith and credit by a federal or state court in the United States. *Id.*

116. In the instant action, Van Driessche does not allege there is another Hague petition adjudication in the United States or in Belgium. Accordingly, there is no other Hague Petition adjudication to which this Court considers deferring as a matter of comity. The full faith and credit provision of ICARA does not require this Court, as a matter of comity and res judicata, to accord full faith and credit to the underlying Belgian court interim orders or its custody determination. *See id.*

117. Notwithstanding that this Court finds it is not bound by the Belgian court's adjudication of custody and that no other custody determination has been made, the Court considers whether Van Driessche had merely a right of access and not a right of custody at the time of Melissa's removal under the Convention or ICARA.

118. Smith correctly argues that a parent with a mere right of access does not have a right of custody to invoke the Convention protections that require this Court to return the child. The Convention distinguishes between a right of custody and a right of access.[20] *Croll v. Croll*, 229

---

20. Hague Convention, art. 5, defines a right of custody as "rights relating to the care of

the person of the child, and in particular, the right to determine the child's place of resi-

F.3d 133, 137 (2d Cir.2000). Moreover, courts in the United States have jurisdiction to enforce the Convention by ordering a child's return only if it has been removed in breach of a petitioning parent's custodial rights, not in breach of a petitioning parent's rights of access. *Croll*, 229 F.3d at 135. Therefore, the Hague Convention return remedy is not available to parents who possess only access rights. *Gonzalez*, 311 F.3d at 945.

119. However, the distinction between a right of custody and right of access is generally made *after* the parents adjudicated their respective custody rights in a prior custody proceeding or reached a custody agreement. *See Gonzalez*, 311 F.3d at 954 (holding the remedy of return is not available to a parent who possesses only access rights *where a Mexican court has already decided the rights of both parents*) (emphasis added); *Fawcett v. McRoberts*, 326 F.3d 491, 499 (4th Cir.2003) (finding that a *divorce decree* giving the father exclusive authority to determine a child's residence did not confer a right of custody upon the mother, but only a right of access) (emphasis added); *Croll*, 229 F.3d at 139, 142 (finding a *custody order* granting mother sole custody of the child did not confer custody rights on the father, even when coupled with a *ne exeat* clause limiting the mother's custodial power to expatriate the child) (emphasis added); *Furnes*, 362 F.3d at 706, 712 (finding that a *custody agreement* between the parents providing joint parental responsibility, under Norwegian law and coupled with a *ne exeat* right, gave the father custody rights under the Hague Convention) (emphasis added). Thus, the Court finds the Hague Convention distinction between rights of custody and rights of access is inapplicable to the instant action because Smith's and

Van Driessche's parental rights have not been legally established either by adjudication or by agreement.

120. However, even though the parties have not adjudicated or agreed to their parental rights, Van Driessche is not necessarily precluded from asserting that he has custody rights under the Hague Convention or ICARA, as explained by 51 Fed.Reg. 10,494.

 121. Children who are wrongfully removed or retained prior to entry of a custody order are protected by the Convention, and under the Convention, a child will be ordered returned in pre-decree abduction cases as well as in cases involving violations of existing custody orders. 51 Fed.Reg. at 10,505. A person whose child is abducted prior to the entry of a custody order is not required to obtain a custody order in the State of the child's habitual residence as a prerequisite to invoking the Convention's return provisions. 51 Fed. Reg. at 10,506. In the United States, generally both parents have equal rights of custody of their children prior to the issuance of a court order allocating rights between them. *Id.*

122. Additionally, a court's prior order initially setting forth a visitation schedule does not alter a presumption of joint custody. *Bader*, 445 F.3d at 350. Moreover, in the absence of a custody decree at the time of removal, a foreign court's subsequent award of sole custody to the parent seeking the child's return suggests the seeking parent retains some custodial rights under the Hague Convention. *See Bader*, 445 F.3d at 351.

 123. In the pre-custody decree circumstances of the case at bar, Van Driessche's custody rights under Belgian

---

dence." In contrast, a right of access is defined as "the right to take a child for a limited period of time to a place other than the child's habitual residence."

law are established as a matter of Illinois law. The general rule, without fully adjudicating the merits of the custody dispute, is that Smith and Van Driessche have equal rights of custody prior to a decree adjudicating custody. *See* 51 Fed.Reg. at 10,506. The Belgian court initially issued a visitation schedule awarding Van Driessche access to Melissa one week out of two, but this order did not alter Van Driessche's custody rights. *See Bader*, 445 F.3d at 350.

124. Moreover, even in the absence of a custody decree at the time Melissa was removed and without relying on the Belgian court's March 11 Order, the Belgian court's subsequent award of sole custody to Van Driessche suggests that Van Driessche had some custodial rights over Melissa at the time of her removal. *See Bader*, 445 F.3d at 351.

125. Additional facts support finding that Van Driessche had custody rights at the time of Melissa's removal under the Hague Convention. Smith and Van Driessche were living together when Smith became pregnant and when she gave birth to Melissa. They jointly decided Melissa would be born in the United States. Van Driessche flew to Chicago to attend Melissa's birth, and he signed the Acknowledgment of Paternity in Chicago. Under general United States law, both parents have equal rights of custody prior to the issuance of a court order allocating rights between them. 51 Fed.Reg. at 10,506.

126. Thus, the Court finds that Van Driessche has rights of custody under the Hague Convention and ICARA in this precustody-decree Hague Petition and that Smith's removal of Melissa from Belgium breached his custody rights.

### 3. *Exercise of Custody Rights*

127. Finally, for Melissa's removal to be wrongful, Van Driessche must show that he was, or otherwise would have been, exercising custody rights to the child under Belgian law at the moment of removal. *Bader*, 445 F.3d at 349; *Ruiz*, 392 F.3d at 1251.

128. Melissa was removed from Belgium in March 2001. Notwithstanding the few weeks Smith went to Houston in January 2001, Smith and Van Driessche lived together in Van Driessche's home from October 2000 until December 2001, shared parental responsibilities, and enrolled Melissa in a daycare.

129. After the parties' argument in December 2001 and prior to March 2002, when Smith left Belgium, Smith did not live with Van Driessche but remained in Belgium. During this time, both parents spent time with Melissa, and Van Driessche filed suit to determine his custody rights.

130. The Court concludes that Van Driessche was exercising his rights of custody at the time of Melissa's removal from Belgium.

131. Based upon the foregoing, the Court concludes Van Driessche has satisfied his burden by a preponderance of the evidence that Melissa was habitually residing in Belgium, he had rights of custody, and he was exercising those rights at the time of removal. Consequently, Melissa's removal from Belgium was wrongful as defined by the Hague Convention. *Bader*, 445 F.3d at 349.

### B. DEFENSES TO WRONGFUL REMOVAL

132. Although the Hague Convention mandates the return of a child wrongfully removed, the judicial duty to order return of a wrongfully removed or retained child is not absolute. 51 Fed.Reg. at 10,509.

133. Under the Convention, if Smith can establish one of the four affirmative

defenses, the Court should not or need not order that Melissa be returned to Belgium. *See In re DD*, 440 F.Supp.2d 1283, 1293 (M.D.Fla.2006); *see Silvestri v. Oliva*, 403 F.Supp.2d 378, 387 (D.N.J.2005).

■ 134. Courts should narrowly interpret a defense and allow it to prevent the child's return only in meritorious cases when the person opposing return has met the burden of proof.[21] 51 Fed.Reg. at 10,509.

### 1. Human Rights and Fundamental Freedoms

135. The first defense under the clear and convincing standard is that, even though Melissa was wrongfully removed, returning her to Belgium would violate Smith's human rights and fundamental freedoms.[22] *See Friedrich*, 78 F.3d at 1067.

136. In the instant action, Smith invokes the human rights and fundament freedoms exception under the concept that it "offends all notions of due process." She argues the Belgian court had no personal jurisdiction over her to enter an order.[23] Moreover, without the March 11 Order, Van Driessche had no parental authority. Therefore, Smith reasons this Court lacks jurisdiction to apply the Hague Convention's return provisions.

■ 137. However, a court in the abducted-to nation has jurisdiction to decide the merits of the abduction claim. *See Friedrich*, 78 F.3d at 1063.

138. Moreover, because a child is protected by the Hague Convention even before custody rights are determined, Van Driessche has sufficient custody rights to bring his Hague Petition. *See* 51 Fed.Reg. at 10,505. The Court finds that Van Driessche had sufficient rights to bring his Hague Petition without the Belgian court's March 11 Order or subsequent default custody adjudication.

■ 139. Because this Court has jurisdiction to determine the merits of Van Driessche's abduction claim under the Hague Convention and does not rely on the Belgian court's custody determination, the Court need not address whether the Belgian court's orders violate Smith's due process rights for lack of personal jurisdiction. Thus, Smith has not shown by clear and convincing evidence that returning Melissa to Belgium would violate the fundamental principles of human rights and fundamental freedoms. *Friedrich*, 78 F.3d at 1067.

### 2. Grave Risk of Harm

■ 140. The second defense under the clear and convincing standard is that returning Melissa to Belgium would ex-

---

**21.** The exceptions are narrow because the whole structure of the Convention seeking to promote mutual confidence in alternate forums would collapse if parents who wrongfully remove children from their habitual residence are allowed to broadly invoke exceptions. *See Blondin v. Dubois,* 189 F.3d 240, 246 (2d Cir.1999).

**22.** The human rights and fundamental freedoms exception utilizes a broad phrase that could encompass extreme circumstances not covered by the exceptions. *See* 51 Fed.Reg. at 10,510. Although the countries negotiating

the Hague Petition desired to prevent a broad "public policy" type of exception because it would undermine the fabric of the Convention, this exception could be invoked if returning a child would shock the conscience of the court or offend all notions of due process. *See id.*

**23.** Smith also alleges she could not understand French, the language used at the March 11 hearing. Consequently, she did not know that the Belgian court ordered a resumption of the proceedings to determine Van Driessche's custody rights.

pose her to physical or psychological harm. *See Friedrich,* 78 F.3d at 1067.

141. This exception requires the alleged physical or psychological harm to be "a great deal more than minimal." *Whallon v. Lynn,* 230 F.3d 450, 459 (1st Cir. 2000).

142. In order to invoke this exception, the Respondent must show by clear and convincing evidence that returning the child would place the child in an intolerable situation. *England v. England,* 234 F.3d 268, 270 (5th Cir.2000).

 143. Van Driessche took an active role in Melissa's care while she was in Belgium, and there is no evidence in the record that he mistreated Melissa either physically or psychologically. The Court notes that the Belgian court indicated that allegations of Van Driessche's drinking problems did not warrant depriving him of his rights of access to Melissa.

144. Moreover, although Smith alleges Van Driessche was abusive to her, she does not allege he was abusive to Melissa. For these reasons, the Court finds that returning Melissa to Belgium would not expose her to a grave risk of physical or psychological harm.

### 3. Acquiescence

145. Smith does not assert the third defense that Van Driessche acquiesced to Melissa's removal from Belgium. *See Friedrich,* 78 F.3d at 1067. The parties do not dispute that Van Driessche did not consent to Melissa's removal from Belgium.

### 4. One Year/Well–Settled Defense

 146. The fourth defense, which Smith must establish by a preponderance of the evidence, is that Van Driessche filed his Hague Petition more than one year after Melissa's removal, and Melissa has become settled in her new environment in Houston. *Friedrich,* 78 F.3d at 1067. If the defense is established, a court is not obligated to return the child. 51 Fed.Reg. at 10,509; *In re DD,* 440 F.Supp.2d at 1293.

 147. If those two elements are established, the Court next considers whether the one-year limitation period should be equitably tolled. Equitable tolling would apply, even if Melissa is well-settled, in the event that Smith took significant, active steps to conceal Melissa from her father while Van Driessche was actively seeking Melissa's whereabouts. *Furnes,* 362 F.3d at 723–24; *Lynch v. Lynch,* 220 F.Supp.2d 1347, 1363 (M.D.Fla. 2002).

### A. One–Year Limitation

148. Melissa was removed from Belgium in March 2002, and Van Driessche filed his Hague Petition on June 5, 2006.

149. The parties do not dispute that Van Driessche did not timely file his Hague Petition seeking Melissa's return.

150. Because more than four years elapsed between Melissa's removal from Belgium and the filing of the Hague Petition, the Court finds Smith has met the first element of this defense.

### B. Well–Settled

 151. In determining whether the child is well-settled, courts consider the following factors: (1) the age of the child; (2) the stability of the child's new residence; (3) whether the child attends school or daycare consistently; (4) whether the child attends church regularly; (5) the stability of the mother's employment; and (6) whether the child has friends and relatives in the area. *In re Ahumada Cabrera v. Lozano,* 323 F.Supp.2d 1303, 1314 (S.D.Fla.2004).

152. Additionally, for the child to be well-settled, the court should consider more than whether he or she has a comfortable material existence, taking into consideration the child's living environment and any active measures taken to conceal a child. *Lops*, 140 F.3d at 946.

■ 153. Melissa is now six years old and has been continually residing in Houston for two-thirds of her life. She lived with her mother and her aunt at one location for more than two years, lived in another location for a short time, and recently moved to a third location as her mother has become more independent and able to live on her own with Melissa.[24]

154. Van Driessche concedes that Melissa is well-settled in Houston.

155. Accordingly, there is nothing in the record to suggest that Melissa is not well-settled in Houston. To the contrary, the Court finds there is substantial evidence that Melissa is well-settled in Houston within the meaning of the Hague Convention's one year/well-settled defense. Thus, Smith has met her burden to prove by a preponderance of the evidence that the Hague Petition seeking Melissa's return was filed more than one year after Melissa was removed from Belgium, and Melissa is well-settled in Houston.

## C. Equitable Tolling

156. Even if the Hague Petition was filed more than one year after the child was removed and the child is well-settled, the court should determine whether equitable justifications exist for tolling the one-year limitation period.[25] *Furnes*, 362 F.3d at 723–24; *Belay v. Getachew*, 272 F.Supp.2d 553, 562 (D.Md.2003); *Lynch*, 220 F.Supp.2d at 1363.

■ 157. The purpose of equitable tolling is to ensure that a parent who takes intentional and significant steps to conceal his or her children for more than one year will not be rewarded for that misconduct by creating eligibility for an affirmative defense not otherwise applicable. *Furnes*, 362 F.3d at 723 (citing *Lynch*, 220 F.Supp.2d at 1363); *accord Lops*, 140 F.3d at 946.

158. In those circumstances in which the abducting parent has concealed the child, the one-year limitation period has been tolled until the parent seeking the child has located him or her. *Furnes*, 362 F.3d at 723; *Belay*, 272 F.Supp.2d at 564–65.

159. In considering all the circumstances regarding the one year/well-settled defense, courts have also examined whether a parent who wrongfully removes a child will be prosecuted for concealment of the child. *Lynch*, 220 F.Supp.2d at 1363–

---

**24.** Moving several times may indicate that a child is not well-settled. *See generally In re Ahumada Cabrera*, 323 F.Supp.2d at 1314 (noting that a child, who had changed residences five times in two and one-half years, was not well-settled). However, the *In re Ahumada Cabrera* court found that, in addition to moving five times, the mother had an uncertain immigration status that weakened the mother's prospects of long term job stability. In the instant action, Smith has a permanent resident visa, apparently stable employment, and has been able to leave her sister's residence to establish her own residence. Accordingly, living in three places in four years,

under the circumstances, does not warrant a finding that Melissa is not well-settled.

**25.** Neither the Convention nor ICARA specify that Article 12 should be subject to equitable tolling; rather, the drafters of the Hague Convention decided that after the passage of a year, it became a reasonable possibility that the child could be harmed by its removal from an environment into which the child has become settled, and that a court ought to be allowed to consider this factor in making the decision whether to order the child's return. *Belay*, 272 F.Supp.2d at 562–63.

64; *In re Ahumada Cabrera*, 323 F.Supp.2d at 1314 (citing *Lops*, 140 F.3d at 946).

160. Thus, to determine whether equitable tolling applies in the instant petition, the Court considers: 1) Van Driessche's efforts to locate Melissa, 2) the criminal proceeding filed against Smith, and 3) the length of time the limitation period should be equitably tolled.[26] *See Furnes*, 362 F.3d at 723–24; *Lynch*, 220 F.Supp.2d at 1363.

### 1. Active Concealment

161. The one-year limitation period to file a Hague Petition has been tolled because the abducting parent took significant, active steps to conceal the child from the parent seeking his return. *Furnes*, 362 F.3d at 723–24 (tolling the limitation period four to six months due to respondent's concealment of the child and petitioner's extensive efforts to locate them); *Lops*, 140 F.3d at 933, 946 (finding that respondent and his mother took significant measures to conceal the child, including purchasing a home but keeping it in the seller's name, transacting business only in cash, refraining from taking a job that required disclosing a social security number, not paying taxes, not obtaining a driver's license, and essentially avoiding any electronic identity); *Lynch*, 220 F.Supp.2d at 1363 (tolling limitations period six to nine months because respondent concealed the child by living with friends of others or in public abuse shelters, telling her husband she was on vacation but would return, threatening to go underground with the children or take radical steps to

change her identity, using a commercial post office box, and numerous other steps to conceal her location); *In re Ahumada Cabrera*, 323 F.Supp.2d at 1309 (tolling limitations period because respondent promised to come back at a future date, threatened to "get lost" if petitioner insisted the child be returned, and threatened to deprive petitioner of all communications with his daughter if he initiated proceedings against them through the Central Authority).

162. In the instant action, Smith left Belgium with Melissa in March 2002. She traveled back to her home country, Nigeria, where she arrived a few weeks later. There is no evidence in the record to indicate that Smith communicated with Van Driessche during this time.

163. Smith lived in Nigeria from approximately April 2002 until November 2002. Eight months after leaving Belgium, in November 2002, Smith arrived in Houston with Melissa.

164. Smith applied for a driver's license and permanent resident visa using her correct address shortly after she arrived in Houston. She also applied for Melissa's identification card using Melissa's real name and their address. In August 2004, Smith registered Melissa in school under her correct name.

165. Although Smith openly used valid legal names and addresses in Houston, Smith testified, and the record reflects, that she did not tell Van Driessche where she was living after she left Belgium.

---

**26.** Additionally, in determining whether equitable tolling applies to this instant petition for Melissa's return, which was filed four years after her removal from Belgium, the Court considers the Convention's goals: 1) protecting children from a second removal from the new environment and 2) precluding an abducting parent who secretes a child from claiming the child has become well-settled precisely because the child was being secreted from the parent seeking the child's return. *See Belay*, 272 F. Supp 2d at 561, 563; *see In re Robinson*, 983 F.Supp. 1339, 1345 (D.Colo. 1997).

166. Accordingly, the Court concludes that although Smith did not actively conceal her whereabouts, she did not reveal to Van Driessche that she and Melissa were living in Houston.

167. The Court notes that the Convention provides no guidance about whether Smith has an affirmative duty to reveal her location or whether Van Driessche has an affirmative duty to seek his child in order to invoke equitable tolling.

168. However, in order to be consistent with the purposes of the Convention, the Court finds that some period of equitable tolling should apply because Smith did not reveal her location in Houston to Van Driessche, which could have precluded him from filing his Hague Petition. Hague Convention, at preamble; *Furnes*, 362 F.3d at 723.

169. Thus, the Court considers equitable tolling of Smith's defense in light of Van Driessche's overall conduct in seeking Melissa's return.

### 2. *Efforts to Locate the Child*

170. In determining the application of equitable tolling, a petitioner's efforts to seek the child's return are also considered. *Furnes*, 362 F.3d at 708–09 (applying tolling after the father began ceaseless efforts to locate his child and her mother by contacting the landlord of the mother's home, contacting the local post office to find a forwarding address, contacting her relatives both at home and work, begging them to reveal her whereabouts, and traveling to Florida and Georgia in the United States after having been informed that they might be living there); *Lynch*, 220 F.Supp.2d at 1352–53 (applying tolling after the father sought his child's location by "bombarding" his friends and acquaintances with calls, contacting the International Police (Interpol), and calling every Vazquez in Miami, Florida trying to locate

them); *Wojcik v. Wojcik*, 959 F.Supp. 413, 420–21 (E.D.Mich.1997) (finding no reason to apply equitable tolling because the mother did not hide the children, and the father did not take any actions to seek their return other than filing for divorce).

171. Van Driessche testified he contacted the Belgian police after Smith left Belgium with Melissa. He avers he has taken continuous efforts to find them with help from investigators, the Belgian Police, and the FBI.

172. The record reflects that after Smith left Belgium with Melissa, Van Driessche did not call Smith's parents in Nigeria, her sister Catherine in Houston, or any of Smith's other family and friends.

173. Van Driessche testified that he did not use any public or internet informational resources to inquire about Catherine's Houston phone number, although he told Smith that he did not have her current number.

174. Although Van Driessche contacted the Belgian police at some point after Smith left in March 2002, there is no evidence in the record to suggest that Van Driessche personally took any other steps to seek Melissa's return until he authorized the Belgian Central Authority to seek Melissa's return on July 20, 2005. Although Van Driessche avers he was continually seeking to locate Smith and Melissa with help from investigators and the FBI, there is no evidence in the record to suggest that the FBI began looking for Smith until after this Court's December 2004 Order.

175. Consequently, the record reflects Van Driessche's personal efforts to find Melissa include contacting the local Belgian police in March 2002 shortly after Smith left and authorizing the Belgian Central Authority on July 20, 2005, to seek

Melissa's return more than three years after she was removed from Belgium.

176. The Court also notes that based on the international nature of their relationship, the past experiences of both parties traveling to the United States, having their child in the United States, and the fact that Smith had no job or means of supporting herself in Belgium, it was obvious that Smith was unlikely to stay in Belgium and could relocate to the United States.

177. Furthermore, Van Driessche, who is still employed by the Belgian Ministry of Foreign Affairs, would have far greater experience, government connections, and familiarity with international affairs than the average citizen seeking a child who apparently disappeared across a country's borders. His employment would have made him either personally familiar with or have access to professional advice concerning available legal remedies and governmental procedures which could be utilized to find Melissa.

178. Rather than pursue available legal remedies through the Belgian Central Authority or pursue Melissa's return by making a concerted personal effort to find her in 2002 after Melissa was removed, Van Driessche merely contacted the local Belgian police.

179. Thus, the Court finds Van Driessche's contention that he made continuous efforts to find Melissa after she was removed in March 2002, either personally or with help from investigators and the FBI, is not credible.

### 3. Criminal Proceedings

180. Courts also look at possible criminal proceedings and their potential effect on the child in determining a tolling of the one-year limitation period. *Lynch*, 220 F.Supp.2d at 1363–64 (noting there was little likelihood the respondent would be prosecuted for concealment because petitioner had promised to dismiss any criminal proceedings and believed the children needed their mother); *In re Ahumada Cabrera*, 323 F.Supp.2d at 1314 (citing *Lops*, 140 F.3d at 946 for the proposition that courts should consider the possibility of prosecution for conduct concealing the child).

181. Although Van Driessche alleges he was unaware of Melissa's general whereabouts until April 2005 and her address in May 2006, the Belgian government, on his behalf, submitted the August 2004 letter to the United States seeking information in Houston concerning Smith's whereabouts in an effort to pursue a criminal abduction action against her. As a result, a criminal action was filed in the United States District Court for the Southern District of Texas on December 17, 2004, and this Court's 2004 Order effecting that request was issued. The FBI subsequently initiated an investigation to carry out the Belgian government's request.

182. Van Driessche did not inform the Court of this criminal action begun and filed in 2004. He avers his government made a plea to a foreign government to seek Smith, which he believes supports his contention that he did not know they were in Houston.

183. The Court notes that Van Driessche does not aver that he was unaware that his government filed the August 2004 letter seeking information from Smith's sister in Houston.

184. Smith contends that Van Driessche's email showing that the FBI had located them by April 2005 supports her position that Van Driessche's Hague Petition is untimely because Van Driessche did not file his Hague Petition until June 2006, more than a year after he knew Melissa's whereabouts. Furthermore,

Smith points out that the FBI quickly located them after they began searching because she was not concealing her location.

185. Thus, the Court must determine whether possible criminal proceedings impact the period of equitable tolling to apply to Van Driessche's untimely filing of his Hague Petition in light of the Convention's goals of protecting Melissa from another removal and restoring the pre-abduction status quo. *Furnes*, 362 F.3d at 710; *Belay*, 272 F.Supp.2d at 558, 561.

186. Additionally, the Court considers whether the criminal action shows that Van Driessche had sufficient information that Smith was located in Houston such that he would have known where to file his Hague Petition seeking Melissa's return to Belgium.

187. First, in considering the Convention goals of protecting Melissa, the Court notes that Van Driessche does not indicate that he will not continue to pursue criminal actions against Smith and does not express any interest in protecting Melissa from being deprived of her mother as a possible result of a criminal conviction.

188. Second, Van Driessche recited to the Belgian government the facts used to file the criminal action in Houston. The government's August 2004 letter, the impetus to the 2004 Order, recites nearly all the underlying facts used by Van Drissche to file the instant action. Van Driessche does not explain why, if the government knew to file a criminal action against Smith in Houston in 2004, Van Driessche, or the government on his behalf, did not concurrently file a Hague Petition in Houston seeking Melissa's return.

189. Third, these facts suggest that in 2002, 2003, and 2004, Van Driessche was more motivated to seek criminal charges against Smith than to seek Melissa's return.

190. Thus, the Court finds that Van Driessche had sufficient information to file his Hague Petition in the Southern District of Texas in August 2004, because the underlying facts he recited to his government in the August 2004 letter were used by the Belgian government to file a criminal action against Smith in Houston on December 17, 2004, and were subsequently used to file the instant petition in 2006.

191. Moreover, criminal proceeding against Smith would not restore the pre-abduction status quo and could deprive Melissa of her mother for up to five years under Article 432, § 1 of the Belgian Penal Code.

192. Therefore, possible future criminal proceedings against Smith and the past filing of a criminal action without filing a Hague Petition weigh against this Court precluding Smith from asserting her one year/well-settled defense under the Hague Convention.

### 4. Length of Tolling

193. Having found that some period of equitable tolling applies because Smith did not inform Van Driessche of her whereabouts, the Court must determine how long to toll the one-year limitation period.[27]

194. When the abducting parent has concealed the child, the one-year limitation period has been tolled until the parent seeking the child has located him or her. *Furnes*, 362 F.3d at 723; *Belay*, 272 F.Supp.2d at 564.

195. Even if an abducting parent does not provide an address or phone number to the seeking parent, a petitioner can file a petition with the Central Authority to implement a Hague Convention proceed-

---

27. Van Driessche seeks tolling through May 2006.

ing. *See generally Lynch,* 220 F.Supp.2d at 1354 (noting that when the respondent, who lived in an abuse shelter, did not provide her address or phone number to petitioner, he filed a petition with the Central ·Authority to implement Hague Convention proceedings).

196. Moreover, although courts consider equitable tolling of the one-year limitation period if the child has been concealed, courts have denied a petition under the Hague Convention filed after one year even when one parent wrongfully removed or retained the children. *See Silvestri,* 403 F.Supp.2d at 388 (finding that even though the children were wrongfully retained in the United States, they were settled under the Hague Convention exception, despite petitioner's argument that their relatives lived in Argentina); *Zuker v. Andrews,* 2 F.Supp.2d 134, 142 (D.Mass. 1998) (finding that the children were settled in their new environment, which precluded their return); *Wojcik,* 959 F.Supp. at 421 (finding that even though father contacted the United States Central Authority within a year, the children were settled in their new environment after eighteen months); *In re Robinson,* 983 F.Supp. at 1342, 1346 (finding the children were settled in the United States after living in the same area for twenty-two months and were not required to be returned despite their wrongful removal).

197. Contrary to Van Driessche's position that he did not know where Smith had gone after she left Belgium, the Court notes that the following facts, taken together, indicate Van Driessche had ample evidence to suggest Smith was specifically in Houston and no evidence that she would be anywhere else, other than perhaps at her parents' home in Nigeria:

● In January 2001, Smith traveled to Houston as a result of her difficulties with Van Driessche, and the next month Van Driessche followed her to Houston and convinced her to return to Belgium with him.

● Within six months of Smith's leaving Belgium, in October 2001, Van Driessche asked Smith if she was in Houston. Moreover, they agreed to meet in Houston on October 13, 2002 even though the meeting did not take place.[28]

● As of August 30, 2004, Van Driessche and/or his government drafted a letter rogatory instituting a criminal proceeding against Smith and asked the United States to seek information about Smith from her sister Catherine in Houston. Based upon the information supplied to the government by Van Driessche, the August 2004 letter specifically requested information from Catherine in Houston and stated "it would· be advisable to check whether Ohio Esezeobo Bibiana [Smith] and her girl would be staying on American soil."

● In March 2005, Smith told Van Driessche in an email that he should send money for Melissa's support to Houston.

● In April 2005, Van Driessche was informed that the United States FBI had located Smith.

198. Thus, the Court finds Van Driessche had ample evidence that Smith

---

**28.** *See supra* para. 60 and notes 14, 16. Because Van Driessche requested the Court to consider the documents in the *Ex Parte* Application and because the Court considers any relevant factor to determine if equitable tolling applies to the merits of the well-settled defense, the Court incorporates the facts set forth in the August 2004 letter. *See Lynch,* 220 F.Supp.2d at 1363 (citing *Lops,* 140 F.3d at 946 for the proposition that the Court should look at a number of relevant factors to determine whether children are well-settled).

would be found not only in the United States, but specifically in Houston, well before May 2006.

199. Moreover, Van Driessche could have contacted the Belgian Central Authority to seek Melissa's return under the Hague Convention, regardless whether he had an exact address in the United States. *See Lynch*, 220 F.Supp.2d at 1354. However, it was not until July 2005, three years after Melissa's removal, that Van Driessche authorized the Belgian Central Authority to take action on his behalf.

■■■ 200. Based upon the foregoing facts and equitable considerations, the Court concludes that the limitations period should be tolled until August 2004, the date of the letter submitted by the Belgian government to the Southern District of Texas. Van Driessche, or the government on his behalf, could have concurrently filed a Hague Petition seeking Melissa's return based upon the same information contained in the August 2004 letter.

201. Alternatively, the Court finds that if Van Driessche did not have sufficient knowledge that Smith was in Houston in August 2004 to file his Hague Petition, the limitations period should be tolled until April 2005 when the FBI indicated to Van Drissche that it had located Smith. Knowing that Smith was in the United States, and based upon Smith's prior visits to her sister's home in Houston and her March 2005 email telling Van Driessche to send money to Houston, Van Driessche could have filed his Hague Petition in Houston at this time.

202. Thus, even if the Court finds the limitations period tolled until April 2005, Van Dreissche's Hague Petition is untimely filed, and Smith is not precluded from asserting her defense.

ATTORNEY FEES

203. Under ICARA, the Court may award attorney fees to a parent who successfully invokes his Hague Petition remedy.

■■■ 204. The purpose of the fee-shifting provision is to restore the petitioner to the financial position he or she would have been in had there been no removal and to deter such conduct from happening in the first place. 51 Fed.Reg. at 10,511.

■■■ 205. However, Van Driessche has not prevailed on his Hague Petition seeking Melissa's return, and the Court declines to award expenses or costs to either party.

### CONCLUSION

206. The Court finds Smith took no active steps to conceal Melissa, and the circumstances of the case at bar do not warrant either depriving Smith of the one year/well-settled defense or uprooting Melissa from her home in Houston, where she has lived most of her life.

207. Moreover, the Court finds that because Smith did not take intentional and significant steps to conceal Melissa, Smith is not being rewarded for her misconduct by creating eligibility for an affirmative defense not otherwise applicable. *Furnes*, 362 F.3d at 723 (citing *Lynch*, 220 F.Supp.2d at 1363); *accord Lops*, 140 F.3d at 946.

208. The Court finds Melissa is well-settled in Houston, and it is in Melissa's best interest to deny Van Driessche's Hague Petition in support of the Convention's goal of not only protecting children from wrongful removal but also protecting children from a second removal from a new environment to which they have become connected or settled. *Belay*, 272 F.Supp.2d at 561; *In re Robinson*, 983 F.Supp. at 1345.

209. The Court finds that Van Driessche's petition is not timely filed because equitable tolling applies only through August 2004, and the Petition was filed in June 2006. Even if equitable tolling applies through April 2005, the Hague Petition is still filed outside the one-year limitation period.

210. Moreover, the Court finds that Van Driessche's limited efforts to locate Melissa support the Court's conclusion that denying the petition is in Melissa's best interest.

211. Based upon the foregoing, the Court finds Smith is not equitably estopped from asserting her defense.

212. Consequently, the Court denies Van Driessche's Hague Petition. According to the foregoing, the Court hereby

ORDERS that Van Driessche's Petition for Return of Child under the Hague Convention (Instrument No. 1) is DENIED.